*Champaign, Clark, Darke, Greene, Miami and*
*Montgomery Counties*
*Hon. William H. Wolff, Jr., P.J., Hon. James A. Brogan,*
*Hon. Mike Fain, Hon. Thomas J. Grady,*
*Hon. Richard K. Wilson*

---

**ERB Lumber Co.**
**v.**
**First Federal Savings & Loan Assoc.**
**of Lima**
*[Cite as 4 AOA 39]*

*Case No. 12046*
*Montgomery County (2nd)*
*Decided June 1, 1990*

*R.C. 1311.011*

*Stephen E. Klein, 35 Dellsing Drive, Vandalia,*
*Ohio 45377, for Plaintiff-Appellant.*

*Michael P. Moloney, 100 W. Second Street, P.O.*
*Box 1288, Dayton, Ohio 45402, for Defendant-*
*Appellee.*

BROGAN, J.
   Appellant, ERB Lumber, d.b.a. P.K. Lumber Company, ("P.K."), appeals from a summary judgment granted by the trial court in favor of appellee, First Federal Savings & Loan Association of Lima, ("First Federal").
   In its complaint, filed June 20, 1989, P.K. alleged that First Federal breached its construction loan agreement with Terry and Sharon Fleming and consequently breached the statutory duties owed to P.K. as a third party beneficiary of that contract, pursuant to R.C. 1311.011(B).
   Following discovery, which included interrogatories and a number of depositions, P.K. moved for summary judgment on November 9,

1988. On January 4, 1989, the trial court ruled that although no material issue of fact was in dispute, P.K. was not entitled to judgment as a matter of law. Thereafter, First Federal filed its motion for summary judgment which was granted by the trial court on January 18, 1990.
   Between June 2, 1987 and March 29, 1988, Bruce Niswonger, d.b.a. Consolidated Builders, constructed the home of Terry and Sharon Fleming. To finance their home, the Flemings obtained a construction loan from First Federal in the amount of $148,400. Loan funds were distributed to Niswonger upon approval of First Federal's disbursement agent, Title Pointe Agency, Inc. ("Title Pointe"). P.K. alleges that the loan proceeds were distributed in a grossly negligent manner and that as a result, the loan was closed prior to P.K.'s receipt of payment for materials utilized in the construction of the Flemings' home.
   The disbursement procedure employed by Title Pointe is as follows. Niswonger would present a draw request and an affidavit required by R.C. 1311.011(B)(4). The affidavit reflected the amounts Niswonger had paid to all subcontractors and materialmen for work or materials provided and indicated that no claims against the residence existed except those specifically identified therein. Niswonger would simultaneously submit to Title Pointe personal checks payable to the subcontractors and materialmen listed in the affidavit and envelopes addressed to the appropriate parties. A lien release, sent along with payment to the subcontractors and materialmen, was to be returned by them to Title Pointe. Upon reconciling the amounts listed as due in the affidavit and the total of the checks submitted by Niswonger, Title Pointe would issue a cashier's check drawn against the construction loan.
   In support of its claim of gross negligence, P.K. calls five particular disbursements into question: October 8, 1987, October 27, 1987,

November 30, 1987, December 3, 1987 and March 29, 1988. In the aggregate, these disbursements reflect that on two occasions, Niswonger dated his personal checks after the draw date, that subcontractors and materialmen sometimes received more and sometimes less than the amount listed in the affidavit, (*i.e.* the affidavit and Niswonger's personal checks did not reconcile), and that some subcontractors and materialmen received no payment despite the fact that Niswonger received loan funds based on his affidavit reflecting that he had paid them.

P.K. alleges that several additional occurrences support its claim of gross negligence against First Federal. In one instance, Niswonger listed a false address for one of the subcontractors on an affidavit. P.K. argues that this rendered the affidavit fraudulent on its face and that Title Pointe was unjustified in disbursing funds pursuant to that affidavit.

Further, P.K. avers that prior to the dates of the five disbursements mentioned above, Title Pointe and First Federal knew that Niswonger had forged the owners' (Flemings) endorsement on a draw request and on several disbursement checks. Also prior to these disbursements, P.K. alleges that First Federal was aware that in late August, 1987, a large quantity of lumber was delivered to the Flemings' homesite but was moved and incorporated into a spec home being built by Niswonger.

In her deposition, Title Pointe agent Jacqueline Mayerson admitted that a number of lien releases were not obtained from subcontractors or materialmen who had purportedly been paid by Niswonger.

Despite these irregularities, the disbursement procedure was not modified until after a draw on December 4, 1987, at which time Title Pointe began to issue checks directly to the subcontractors and materialmen.

The construction loan closed on March 29, 1988. On that date, Niswonger submitted his final affidavit and disbursement request. The affidavit reflected that P.K. was owed $3,200. However, P.K. claims that it never received this amount because First Federal failed to disburse it. P.K. alleges that First Federal disregarded its knowledge of Niswonger's pattern of wrongful behavior and relied on Niswonger's statement that P.K. actually owed him a credit on the Fleming account, which would offset the amount reflected on his affidavit.

In its defense and in support of its motion for summary judgment, First Federal submitted the affidavits of Stanley D. Cohen, C.E.O. of Title Pointe, and Arthur Millonig, retained as an expert witness by First Federal. In his affidavit, following a description of the loan disbursement method, Cohen averred the following:

"6. This procedure which I devised and supervised is, in my opinion, a reasonable and prudent method of disbursing a construction loan.

"7. While we attempt to get lien releases, it is not a mandatory part of the procedure and in the absence of any notice from any materialmen or subcontractors that they are not being paid I do not expect that or demand that all lien releases be obtained before proceeding with the next draw.

"8. I was made aware that Bruce Niswonger had forged Terry Fleming's signature on a disbursement check in August of 1987.

"9. I was instructed by Terry Fleming to interview Mr. Niswonger regarding the signing of Mr. Fleming's name and to question him on this matter. Mr. Fleming instructed me to continue to disburse the loan to Mr. Niswonger if I found him to be contrite and if I believed that this was an isolated incident.

"10. I met with Mr. Niswonger in August of 1987 with reference to Mr. Niswonger's signing Mr. Fleming's name to draw checks. Mr. Niswonger explained that he had only signed Terry Fleming's name because Terry Fleming was out of town and that Mr. Niswonger needed to pay his subcontractors and materialmen. He explained that he had no intent to defraud anyone and that he would not do anything like this again. It appeared that all the money had gotten to the appropriate subcontractors and materialmen. Based on this conversation with Mr. Niswonger, the input of my client First Federal and of First Federal's borrower, Terry Fleming, we determined to continue to disburse to Mr. Niswonger.

"* * *

"12. In the course of disbursing this loan I received no materialmen's certificates from any materialmen or subcontractors except one from P.K. Lumber Company in September of 1987. A lien release was obtained shortly after we received this materialmen's certificate.

"13. The only other written notice of a claim I received from a materialman or subcontractor on this job was the mechanic's lien filed by Merrick & Sons. At that time we were writing checks directly to materialmen and subcontractors and believed that this precaution was suffi-

cient to prevent additional such incidents in the future."

Millonig's affidavit contains his opinion of the disbursement procedure employed by Title Pointe:

"6. In absence of any claims by any materialmen or subcontractors notifying Title Pointe that they had not received their check or the filing of any materialmen's certificates or mechanic's liens, First Federal continued the procedure outlined above and made additional disbursements. Although many lien releases were returned, First Federal did not carry out a strict policy of demanding all lien releases be returned to them prior to the next draw.

"7. Upon receipt of notice that one of the subcontractors hired by Niswonger did not receive a check, First Federal changed its procedure whereby checks were written directly by Title Pointe to subcontractors and materialmen shown on the Affidavit supplied by Niswonger.

"8. It is my opinion based on my experience and my knowledge of the practices of construction disbursements on this area that this procedure was reasonable and is consistent with the standard of care required under these circumstances. This procedure as described above did not constitute negligence, much less gross negligence on the part of First Federal or its agent Title Pointe Agency, Inc."

In his deposition, Bruce Todd, a First Federal employee overseeing the Fleming construction loan, stated that as of December 23, 1987, he knew lumber was mistakenly delivered to the Flemings' site but could not recall whether he knew that the Flemings had been charged for it. Further, as of that date, Todd admitted that he knew of Niswonger's various forgeries but was satisfied that none of the loan proceeds had been misapplied as no subcontractor or materialman had filed a lien against the property.

Terry Fleming, in his deposition, testified that at the time of the closing in August, 1988, he believed that P.K. owed a credit on his account. This belief was based on the fact that Fleming saw the lumber, which was mistakenly delivered to his lot, but never learned that his account was properly credited.

Finally, First Federal asserted that any loss to P.K. was engendered by the failure of P.K. to protect itself from a builder, Niswonger, who P.K. knew to be unscrupulous. The deposition of P.K. employee James Krapf indicates that P.K. was aware of the possibility that a load of lumber was moved from the Fleming lot to another lot.

P.K. credit manager, Brian Siemon, testified that he believed Niswonger to be untrustworthy and deceptive. As of February 1, 1988, Niswonger's account at P.K. showed a credit of $401.14. Yet despite the above described misgivings of P.K. personnel, Niswonger was permitted to charge an additional $13,000 between February and March, 1988.

At the time of the final loan disbursement on March 29, 1988, P.K. had not filed notice of its right to a lien on the Fleming property with First Federal. It appears that Niswonger's final affidavit contained the only indication that P.K. may have been money, and this indication is disputed by Niswonger and Terry Fleming, who believed that P.K. actually owed them credit.

Appellant's two assignments of error are as follows:

"I. THE TRIAL COURT ERRED IN RULING THAT DEFENDANT-APPELLEE WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF-APPELLANT'S CLAIM OF $3,200.

"II. THE TRIAL COURT ERRED IN RULING THAT DEFENDANT-APPELLEE WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO ITS LIABILITY FOR GROSS NEGLIGENCE".

The assignments are combined for discussion as appellant essentially argues that the undisputed facts of this case dictate that appellee's gross negligence entitles appellant to judgment as a matter of law on its claim of $3,200.

Appellee argues that because P.K. failed to appeal from the judgment overruling its motion for summary judgment, we are presently without jurisdiction to review P.K.'s claim. That this argument is meritless is revealed in the syllabus of *State ex rel. Overmeyer* v. *Walinski* (1966), 8 Ohio St. 2d 23: "An order denying a motion for summary judgment is not a final appealable order."

R.C. 1311.011(B) (4) and (5) set forth the duties and liabilities of a lending institution to a materialman pursuant to a home construction contract:

"(4) No lending institution shall make any payment to any original contractor until the original contractor has given the lending institution his affidavit stating:

"(a) That the original contractor has paid in full for all work performed and for all labor, materials, machinery, or fuel furnished by the original contractor and all subcontractors, mate-

rialmen, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor shall specifically set forth and identify both by claimant and by amount claimed;

"(b) That no claims exist other than those claims so set forth and identified in the affidavit required by division (B) (4) of this section.

"(5) When making any payment under the home construction contract or on behalf of the owner or part owner under a home purchase contract, the lending institution may accept the affidavit of the original contractor required by division (B) (4) of this section and act in reliance upon it, unless it appears to be fraudulent on its face. The lending institution shall not be financially liable to the owner, part owner, purchaser, lessee, or any other person for any payments, except for gross negligence or fraud committed by the lending institution in making any payment to the original contractor.

"After receipt of a written notice of a claim of a right to a mechanic's lien by a lending institution, failure of the lending institution to obtain a lien release from the subcontractor, materialman, or laborer who serves notice of such claim is *prima-facie* evidence of gross negligence."

P.K. asserts that as of the date of the final loan disbursement, First Federal had actual knowledge that on several occasions the amounts listed in Niswonger's affidavits and the amount of loan proceeds disbursed did not reconcile, that six lien releases had never been received by them, that Niswonger has forged several signatures, that Niswonger had listed an incorrect address for one payee, and that lumber had been misdelivered to the Flemings yet they were charged for and paid for it.

P.K. argues that this knowledge, combined with Niswonger's affidavit giving First Federal notice of the $3,200 debt to P.K., should have prevented First Federal from closing the loan without paying P.K. That First Federal did close the loan, according to P.K., constitutes gross negligence. We disagree.

We read R.C. 1311.011(B) (4) and (5) to permit a bank to accept the affidavit of a contractor unless it appears fraudulent on its face. Further, the bank will not be liable to a materialman unless the bank commits gross negligence or fraud in disbursing payments to the contractor. One instance of gross negligence is the failure of the bank to obtain a lien release from a material-man who has filed written notice of his right to a mechanic's lien.

Initially, we note that Niswonger's final affidavit wherein it appears that P.K. is owed $3,200, does not constitute the requisite written notice by P.K. of its claim of a right to a mechanic's lien against the Fleming home. Therefore, First Federal had no reason to obtain a lien release from P.K. prior to closing the loan.

As to P.K.'s argument that First Federal was grossly negligent in failing to obtain six lien releases from other subcontractors or materialmen, we observe that R.C. 1311.011(B) does not prohibit the disbursement of construction loan funds until lien releases for prior disbursements are obtained. In addition, First Federal has submitted two affidavits wherein each affiant attests to the reasonableness of the disbursement procedure employed by First Federal.

What R.C. 1311.011(B) does require from the contractor is an affidavit stating that he has paid all subcontractors and materialmen and/or that certain claims remain unpaid. Unless the affidavits are facially fraudulent, a lending institution is entitled to rely on them.

Although P.K. has alleged that in some instances the cashier's check given by First Federal to Niswonger based upon his affidavit did not reconcile with the amounts of Niswonger's personal checks, we do not perceive that P.K. has alleged and proved that any affidavit provided by Niswonger was fraudulent on its face. Appellant alleges that only a single affidavit was fraudulent on its face. In that affidavit, Niswonger listed a false address of a subcontractor. We note, however, that the name of the subcontractor listed on the affidavit was correct. Even if, as appellant suggests, Title Pointe had consulted the telephone directory to verify the correct address, the face of the affidavit reveals at most that the wrong address was mistakenly copied by Niswonger. The only indication that Niswonger intentionally falsified the address on the affidavit was revealed during his deposition on September 14, 1989, when he admitted that he knew the address he wrote on the affidavit was not the correct address of the subcontractor in question. Therefore, unless other conduct by First Federal constitutes gross negligence, we must affirm the decision of the trial court.

In *Thompson Electric Inc. v. Bank One, Akron, N.A.* (1988), 37 Ohio St. 3d 259, the Ohio Supreme Court considered the issue whether a lending institution was liable to a subcontractor for gross negligence pursuant to R.C. 1311.011(B)

(5). The *Thompson* Court, reviewing the concept of "gross negligence", stated the following:

"While fraud is a well-defined concept under Ohio law, the same cannot be said of gross negligence. Distelhorst & Marti, [Ohio Mechanics' and Materialmen's Liens (1986), 127], Section 9-15. An early Ohio Supreme Court case defined 'gross negligence' as the 'failure to exercise any or very slight care.' *Johnson* v. *State* (1902), 66 Ohio St. 59, 67, 63 N.E. 607, 609. See, also, *Cleveland C., C. & I. Ry. Co.* v. *Elliott* (1876), 28 Ohio St. 340, 356-357; *Payne* v. *Vance* (1921), 103 Ohio St. 59, 133 N.E. 85. Prosser states that gross negligence 'has been described as a failure to exercise even that care which a careless person would use.' Prosser & Keeton, Law of Torts (5 Ed. 1984), 212, Section 34." (*Thompson, supra* at 265) (footnote omitted).

In addition to the alleged malfeasance discussed above, P.K. alleges that First Federal was grossly negligent in continuing to disburse loan funds when it knew that Niswonger had previously committed forgery an in closing the loan with knowledge of an outstanding debt to P.K.

Regarding the forgeries, the record reflects that on one occasion, when Niswonger forged the signature of Terry Fleming on a disbursement check, Niswonger met with and explained the incident to Stanley Cohen, who was satisfied that Niswonger had not defrauded Fleming or First Federal. (*See* Cohen affidavit Paragraph 8-10, *supra*). Further, Bruce Todd testified that he was satisfied that all subcontractors and materialmen were properly paid despite Niswonger's forgeries as only one lien was filed against the property during the course of the loan, and this was ultimately released.

The record reflects that First Federal exercised, at minimum, slight care when it disbursed loan funds despite Niswonger's forgeries. At Terry Fleming's request, Stanley Cohen questioned Niswonger regarding one forgery and, based upon his observation that fraud had not been committed by Niswonger, permitted Niswonger to continue to draw funds against the loan. Although it is true that six lien releases were not obtained by Title Pointe during the course of the loan, it is equally true that at the time of closing no liens against the property were outstanding. It is our belief that reasonable minds would agree that while First Federal might have exercised additional caution prior to disbursing loan funds, it did exercise at least slight care in the process.

When the loan closed in March, 1988, Niswonger's final affidavit reflected that $3,200 was owed to P.K. However, their testimony reflects that at that time, both Niswonger and Terry Fleming believed that P.K. actually owed a credit on the Fleming account. Based upon this information, First Federal closed the loan without disbursing fund to P.K. We find that this procedure does not violate R.C. 1311.011(B) (4) and (5).

R.C. 1311.011(B) (4) and (5) require a bank to obtain an affidavit prior to disbursing construction loan funds. This procedure was followed by First Federal. The statute does not require the bank to disburse the entire amount listed in the affidavit. The evidence reflects that First Federal took at least as much care as a careless person would use when it determined not to disburse funds to P.K. as part of the final draw. Not only Niswonger but Terry Fleming believed that the $3,200 owed to P.K. would be set off against a credit from P.K. to Fleming for the misdelivered lumber. Therefore, the closing of the loan without payment to P.K. does not, as a matter of law, constitute gross negligence on the part of P.K.

The summation of the *Thompson* Court is instructive:

"The ultimate issue in this case is who should bear responsibility for the unpaid plumbing and electrical bills. Appellants argues that such responsibility should fall on Bank One, but we question whether such an argument would be necessary if appellants themselves had acted prudently. Despite the fact that appellants knew Purcell was dilatory in paying for their services, they did not file mechanic's liens on the properties, they did not serve written notice on Bank One of their claims to a right to mechanic's liens, or even verbally notify the bank of the financial problems they had encountered with Purcell until after the final affidavits had been executed and disbursements had been made. If, on the other hand, appellants had put Bank One on notice of their claims before the bank received the final affidavits, and the bank had ignored these claims, this would have been *prima-facie* evidence of gross negligence under R.C. 1311.011(B) (5). Obviously, this did not occur in the instant case.

"For the foregoing reasons, we find that the trial court erred in finding as a matter of law that Bank One was grossly negligent. The bank's actions in this case constitute, if anything, ordinary negligence. We do not find that these ac-

tions rise to a level of gross negligence as defined under Ohio law." (*Thompson, supra,* at 270-271) (footnote omitted.

Likewise in the instant case, P.K. failed to notify First Federal of its alleged right to a mechanic's lien until after the loan was closed. Such failure is particularly imprudent when, as the evidence reflects, P.K. knew of Niswonger's questionable business practices yet permitted him to charge a substantial sum of money just two months prior to the close of the loan.

For the foregoing reasons, appellant's assignments of error are overruled. The judgment of the trial court will be affirmed.

*Judgment affirmed.*

WOLFF, P.J., and FAIN, J., concur.