NICHOLS et al., Appellants,

v.

CHICAGO TITLE INSURANCE COMPANY et al., Appellees.

[Cite as *Nichols v. Chicago Title Ins. Co.* (1995), 107 Ohio App.3d 684.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68587.

Decided Dec. 11, 1995.

*Grendell & Marrer Co., L.P.A., Timothy J. Grendell* and *David H. Gunning II,* for appellants.

*Rosenzweig, Schulz & Gillombardo Co., L.P.A.,* and *Bill J. Gagliano,* for appellee Chicago Title Insurance Co.

*Reminger & Reminger Co., L.P.A., Frank Aveni* and *Clifford C. Masch,* for appellee Ameritrust Company National Association.

---

JAMES M. PORTER, Presiding Judge.

Plaintiffs-appellants Frederick W. Nichols, Jr. and his wife appeal from the summary judgment granted by the trial court in favor of defendants-appellees Chicago Title Insurance Company and Ameritrust Company National Association ("Ameritrust") arising out of plaintiffs' claim that defendants were negligent and in breach of contract and their fiduciary duties in disbursing construction loan funds related to the construction of plaintiffs' new home. Plaintiffs claim there were disputed issues of material fact precluding summary judgment. We find no error and affirm the judgments for the reasons hereinafter stated.

Plaintiffs, Frederick W. Nichols, Jr., a lawyer, and his wife contracted with Herbert Building Company, Inc. ("Herbert") in 1989 to build a new home for $406,702 in Moreland Hills. Herbert was not made a party to this case.

Before hiring the builder, plaintiffs hired an experienced architect to design the home, prepare specifications for its construction and put the job out for bids by contractors. The architect prepared and plaintiffs approved detailed plans and specifications for the new home. The plans called for a four-thousand-six-hundred-square-foot home with an estimated cost of $95 per square foot or $437,000.

The job was put out for bid in June 1989. Three builders submitted proposals, one for $525,242, one for $481,818, and Herbert for $432,742. Plaintiffs reduced

the price by deleting items which they did not "think were worth paying for" and asked Herbert to reduce its bid. Herbert deleted some features and then submitted a revised bid of $406,702, which became the lump sum price in the July 12, 1989 contract. Plaintiffs did not require Herbert to post performance and payment bonds permitted by the contract.

Although Herbert's bid was about $100,000 less than the highest bid, Mr. Nichols testified that he expressly asked both his architect and Herbert if the house could be built for the lower price and they said it was "not a problem." During the course of this litigation, plaintiffs contended that the architect and Herbert, who are not parties in this case, "actively knew that the home could not have been built for the contract price." Mr. Nichols testified that he did not believe that Chicago Title had any obligation to verify whether the home could be built for the contract price:

"Q. Did you ever believe that Chicago Title had an obligation to verify whether the home could be built for the contract price?

"A. No."

Mr. Nichols further testified as follows on this point: "It was and is my opinion that my architect should have been confident that the house could have been built for the contract price." He also testified that he did not believe that Ameritrust should have known the house could not be built for the contract price.

Under the construction contract, the general contractor, Herbert, had sole responsibility for the construction work, paying materialmen and subcontractors. The architect was the owners' representative and responsible for administering the contract, conducting site inspections, overseeing progress of the work, making sure that the contract was complied with and certifying amounts due to the contractor for work performed.

After plaintiffs and Herbert signed the construction contract, plaintiffs applied for a $406,700 construction loan at Ameritrust. Ameritrust approved a $300,000 construction loan. The plaintiffs advanced $106,700 to the construction loan fund to make up the difference.

Chicago Title had a prior relationship with Ameritrust in which it would act for Ameritrust in disbursing certain construction loans during the course of the work. Chicago Title would also issue title insurance to Ameritrust to ensure that its construction loan mortgage would have first lien priority. The Nicholses' loan was one of those loans.

On September 27, 1989, plaintiffs, Herbert, Ameritrust and Chicago Title entered into a "Construction Loan Agreement" which forms the basis of plaintiffs' claims in this case. The plaintiffs did not read the loan agreement before signing it nor before filing suit.

Once work began, Herbert became entitled to periodic progress payments based upon the percentage of the job that was completed. Ameritrust hired an inspection firm which sent out an inspector each time a request for payment or "draw" was made by Herbert. The inspector used a checklist provided by Ameritrust to tally the portions of the job that were completed and to arrive at a percentage of completion at the time of each draw request. At the time of each draw request, Herbert submitted to Chicago Title a list of subcontractors to be paid along with the statutory affidavit. Herbert's affidavits, known as "(B)(4) Affidavits" (R.C. 1311.011[B][4]), were delivered by Herbert to Chicago Title with each of the draw requests.

When Chicago Title received a draw request from Herbert, its escrow officer would notify Ameritrust's inspector. The inspector then visited the site, calculated the percentage of the project's completion to date and notified the escrow officer of that percentage. He applied that percentage to the contract price, subtracted the amount of any funds previously disbursed and, if the current draw request was within the percentage of completion, Ameritrust wired the requested funds to Chicago Title. Chicago Title then issued two-party checks to Herbert and the indicated subcontractors on which subcontractors waived liens by endorsement.

The loan agreement did not specifically require Mr. Nichols to sign these draw requests as "Owner." In fact, the agreement does not address this issue at all. Mr. Nichols testified that he signed the requests because Herbert asked him to; he admitted that Chicago Title never insisted that he sign the request forms as the "Owner."

According to the loan agreement, Chicago Title could not disburse more than permitted by the inspector's calculations upon which it was entitled to rely in making disbursements:

"The amount to be disbursed on the date set for each disbursement shall be the percent of the aforesaid loan amount which is equal to the percent of the total construction work that has been completed to said date in accordance with the plans and specifications, less the total amount disbursed by the Title Company prior to the disbursement date * * *. Lender will hire an inspector to perform periodic inspections of the premises, as set forth in Item XII herein. Inspector shall advise Lender and Title Company as to whether or not the disbursement sought is in accordance with the percentage of completion. Title Company may rely on said inspector's report in the course of making its disbursements."

Five situations developed where the draw requested by Herbert exceeded the amount eligible to be paid according to the percentage of completion. Chicago Title advised Herbert that it could not pay the full amount of the draw. Herbert then authorized Chicago Title to delete certain payments from the draw request

so that the amount requested would be within the limits called for by Ameritrust's inspector. Plaintiffs contend that they should have been advised of these "adjustments" to the draw requests by Chicago Title or Ameritrust, although the loan agreement did not require plaintiffs to sign the draw request forms or any revisions to the forms. In each instance plaintiffs had already authorized payment of a higher amount than ultimately paid by Chicago Title.

Plaintiffs were aware that Herbert had submitted certain draw requests to Chicago Title for amounts exceeding that which Chicago Title was permitted to disburse, i.e., in excess of the percentage of completion. Mr. Nichols called the escrow officer at Chicago Title on one occasion to urge him to disburse the funds requested by Herbert. Mr. Nichols testified that he knew that Chicago Title was unable to pay the full amount of certain draws as early as June 1990. Mr. Nichols also admitted on deposition to being told by Herbert that Chicago Title could not make certain payments because "the percentage completion did not match up with the amount being requested."

Eventually, in November 1990, plaintiffs fired Herbert and took over completion of the home, acting as their own general contractor. Plaintiffs claim that they paid an additional $125,000 to complete construction over and above the $406,700 contract price. Plaintiffs sought to recover this additional amount from Chicago Title and Ameritrust. Plaintiffs conceded on deposition that the extra costs were "in reality" what it cost to build the home.

"Q. To what do you attribute the fact that the house cost $125,000 more to build than the contract price?

"A. I attribute it to the fact that that is in reality what it cost, that within the confines of the contract, and what was required of the contract.

"Q. Which contract?

"A. My construction contract.

"Q. With Herbert?

"A. Correct. That all of the items that I paid for in excess of the $406,702 plus the $8,740 in change orders, all of the other items, that's how much they cost, that's what it cost to build the home in accordance with the plans and specifications and construction contract that I signed with Herbert."

Mr. Nichols admitted that he did not contest the accuracy of the calculations of the percentage of completion made by the bank's inspector. He also conceded that Chicago Title never disbursed more money from the construction loan escrow than was permitted by the percentage of completion. He had no knowledge of whether Chicago Title ever overpaid any contractor for work done.

Plaintiffs filed suit against Chicago Title in February 1992 and later added Ameritrust. Three causes of action were asserted: breach of contract, breach of fiduciary duty, and negligence. Following discovery, Chicago Title and Ameritrust filed motions for summary judgment with deposition transcripts, documentary exhibits and an affidavit of the escrow officer. Over plaintiffs' opposition, the trial court granted the summary judgments on January 31, 1995 and a timely appeal ensued.

We will address the assignments of error in the order asserted.

"I. The lower court erred in granting summary judgment in this case to appellees Chicago Title and Ameritrust because there are numerous material issues of fact for which reasonable minds could not come to but one conclusion."

▪ Under Civ.R. 56, summary judgment is proper when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. It is well settled that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265, 278; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–141.

▪ However, the nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099; *Celotex, supra,* 477 U.S. at 322–323, 106 S.Ct. at 2552–2553, 91 L.Ed.2d at 273–274. In accordance with Civ.R. 56(E), "a nonmovant may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial." *Chaney v. Clark Cty. Agricultural Soc.* (1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513, 515.

▪ This court reviews the lower court's granting of summary judgment *de novo*. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157 ("We review the judgment independently and without deference to the trial court's determination"). An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The

reviewing court evaluates the record * * * in a light most favorable to the nonmoving party. * * * [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 50, 593 N.E.2d 24, 26; *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140, 1144.

The gravamen of plaintiffs' claim herein is that neither Chicago Title nor Ameritrust advised plaintiffs when the draw request exceeded the percentage of the completion certificate. Plaintiffs complain that Chicago Title would contact the builder and advise him of the amount in excess, but not the plaintiffs. The builder would then reduce the request by making certain "adjustments" to bring the draw request into line with the percentage of completion certification.

The net effect of this practice was that certain work performed was not being paid for on a timely basis or was being deferred to allow a reconciliation of the draw with the completion certificate. Plaintiffs claim that since they were not timely advised of these deferrals, it resulted in creeping cost overruns, exceeding by $125,000 the budgeted construction fund for the house ($406,700). Plaintiffs argue that if they had been timely advised of this practice, they would have scaled down the work or discharged Herbert and tried to keep the home within the construction budget.

Chicago Title contends that its duty was to disburse construction funds pursuant to the request for draw after assurance that the contractors had waived their claims and that the periodic payments were less than the percentage of the completion certificate. Chicago Title contends that this was done and that the excessive costs ($125,000) to complete the house were the responsibility of the architect and the builder in the nature of cost overruns.

We find that the entries of summary judgments in favor of Chicago Title and Ameritrust were appropriate on plaintiffs' contract and negligence claims because they failed to make a sufficient showing as to one or more essential elements of their claims.

Whether plaintiffs' claims are viewed as sounding in contract or tort, the "essential elements" of their case included (1) that the defendants had breached a duty, and (2) that the alleged damages were the "natural and necessary consequence of" or "proximately caused by" defendants' actions. "It is fundamental that in order to establish actionable negligence, one must show the existence of a duty, a breach of the duty and an injury proximately resulting therefrom." *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173, 543 N.E.2d 769, 772. "Generally, a breach of contract action is pleaded by stating (1) the terms of the contract, (2) the performance by the plaintiff of his obligations, (3) the breach by the defendant, (4) damages, and (5) consideration." *Am. Sales,*

*Inc. v. Boffo* (1991), 71 Ohio App.3d 168, 175, 593 N.E.2d 316, 321. Damages must arise as a result of the breach and must "naturally and necessarily flow" from the breach of contract. *The Toledo Group, Inc. v. Benton Indus.* (1993), 87 Ohio App.3d 798, 806, 623 N.E.2d 205, 210–211; *Homes by Calkins, Inc. v. Fisher* (1993), 92 Ohio App.3d 262, 267, 634 N.E.2d 1039, 1042; *Ziss Bros. Constr. Co., Inc. v. TransOhio* (June 20, 1991), Cuyahoga App. No. 58787, unreported, at 5, 1991 WL 118058. Plaintiffs admitted that the alleged additional expense to complete their home resulted from circumstances which were not the responsibility of Chicago Title or Ameritrust and we believe that this admission was fatal to their claims.

The construction contract with Herbert obligated it to build the home for the fixed price of $406,700 pursuant to the architect's plans and specifications. Neither Chicago Title nor Ameritrust played any role in determining the construction price or in determining that the price was adequate to build the home in accordance with the plans and specifications.

Ameritrust merely made a $300,000 construction loan and arranged for completion inspections. Chicago Title was hired by Ameritrust to be its title insurer and to disburse the construction loan. To define their obligations, plaintiffs, Herbert, Ameritrust and Chicago Title entered into the construction loan agreement in September 1989. The loan agreement limited how much of the construction loan escrow Chicago Title could disburse at any given time.

Specifically, the loan agreement provided that the amount to be disbursed in any "draw" could not exceed the percentage of completion of the house at that time as calculated by the inspection firm hired by Ameritrust:

"The amount to be disbursed on the date set for each disbursement shall be the percent of the aforesaid loan amount which is equal to the percent of the total construction work that has been completed to said date in accordance with the plans and specifications, less the total amount disbursed by Title Company prior to the disbursement date * * *."

The "percentage of completion" was calculated by the inspector and Chicago Title was expressly entitled to rely thereon. Theoretically, the cost of work completed plus the remaining cost of completion should have added up to Herbert's agreed contract price for the home ($406,700). But this presumes that the cost of construction was correctly calculated at the outset, *i.e.*, the home contemplated by the architect's plans and specifications could be constructed and finished for the $406,700 fixed contract price.

Plaintiffs offered no sworn testimony as required by Civ.R. 56 to prove that Ameritrust's inspector miscalculated the percentage of completion or that Chicago Title paid more than it was required to under the loan agreement.

In fact, Mr. Nichols admitted that he had no problem with the calculations of percentage of completion set forth by Ameritrust's inspector:

"Q. All right. Looking along the total percent of completion, and the dates relating to each one, do you contest any of the percentage of completions that are identified on the dates given there?

"A. No.

"Q. Okay. So, for the entire project, where the inspector had come out and done periodic inspections, you do not dispute the percentage of completion that had been identified by the inspectors?

"A. No."

Thus, the alleged insufficiency of the construction loan fund to complete the house was not, by plaintiffs' own admission, attributable to a miscalculation of the percentage of completion by Ameritrust's inspector.

Furthermore, Chicago Title's escrow officer stated in his affidavit that Chicago Title never disbursed more money than permitted by the Ameritrust inspector's percentage of completion. This testimony was never refuted or factually challenged by plaintiffs. In fact, Mr. Nichols did not claim that Chicago Title disbursed more than permitted by the percentage of completion certificates:

"Q. Do you have any knowledge of Chicago Title ever disbursing more money pursuant to a draw request than the amount approved by Ameritrust?

"A. No."

Ameritrust's employee, Linnell Denova, stated that she had no knowledge of Chicago Title mishandling the construction loan escrow. In the face of these admissions, there was no "genuine issue" concerning Chicago Title's or Ameritrust's compliance with the percentage of completion requirement of the loan agreement.

Plaintiffs further admitted in deposition that it was not Chicago Title's or Ameritrust's obligation to compute or verify the construction costs, i.e., to determine that the proposed house could be built for $406,700. That being so, the "damages" (overruns) were not the "natural and necessary consequence of" nor "proximately caused by" an alleged breach of duty by Chicago Title or Ameritrust. The only rational explanation for there being insufficient funds to complete construction of the house is that the construction price was incorrectly calculated by the architect or builder in the first place.

The loan agreement provided as follows with respect to the builder's contract price of $406,700:

"A qualified architect or inspector (referred to throughout this agreement as the 'inspector') shall perform periodic inspections of the construction of the residence. It shall also be the duty of the architect or inspector to review the cost breakdown schedule and the plans and specifications of the residence prior to the start of construction in order to determine that the residence can be constructed as proposed for the price being paid."

Mr. Nichols admitted that there was no "architect or inspector" on this job other than his architect and the inspector hired by the bank to verify the percentage of completion. Mr. Nichols testified that he was relying on his architect to verify the construction costs.

Mr. Nichols admitted that it was his builder, Herbert, that underpriced the construction costs. Mr. Nichols stated in his deposition that the $125,000 in claimed damages was attributable to the actual cost of building the home:

"Q. To what do you attribute the fact that the house cost $125,000 more to build than the contract price?

"A. I attribute it to the fact that that is in reality what it cost, that within the confines of the contract and what was required of the contract.

"Q. Which contract?

"A. My construction contract.

"Q. With Herbert?

"A. Correct. That all of the items that I paid for in excess of the $406,702 plus the $8,740 in change orders, all of the other items, that's how much they cost, that's what it cost to build the home in accordance with the plans and specifications and construction contract that I signed with Herbert."

If Herbert, the architect and plaintiffs underpriced the cost of building the home, their miscalculations cannot be blamed on either Chicago Title or Ameritrust.

Plaintiffs nevertheless complain that Chicago Title committed two alleged breaches of the loan agreement. They contend that Chicago Title disbursed funds to Herbert without first obtaining the affidavits required under the loan agreement. They also contend that Chicago Title was obligated to obtain plaintiffs' approval to any change in a draw request. However, the undisputed facts and plaintiffs' own admissions refute these contentions.

As to the first claimed breach, the loan agreement provided as follows:

"No later than five (5) business days prior to a disbursement, the Owner *or* Builder shall furnish to Title Company (with a copy to Lender) an affidavit of Original Contractor *executed by the Builder* in conformity with the provisions of

Section 1311.04 of the Ohio Revised Code (or other applicable sections) accompanied by the necessary subcontractors' affidavits, and certificates of materialmen (or waivers of lien, releases or receipts in lieu thereof) required by said section. Any amounts shown to be due to contractors, subcontractors and/or materialmen will be paid from the draw allowable." (Emphasis added.)

In other words, there were two options available under the Loan Agreement regarding the type of affidavits to be submitted to Chicago Title: (1) an affidavit of Original Contractor "in conformity with the provisions of Section 1311.04 of the Revised Code * * * accompanied by the necessary subcontractors' affidavits, and certificates of materialmen (or waivers of lien, releases or receipts in lieu thereof) required by such section"; or (2) an affidavit of Original Contractor in conformity with "other applicable sections" of the Revised Code.

The "other applicable section" of the Ohio Revised Code is R.C. 1311.011(B)(4), which provides as follows:

"Notwithstanding sections 1311.02 to 1311.24 of the Revised Code, all liens except mortgage liens that secure payment for work done, or for labor, materials, machinery, or fuel furnished in connection with a home construction contract or in connection with a dwelling or residential unit of condominium property, that is the subject of a home purchase contract are subject to the following conditions:

"* * *

"(4) No lending institution shall make any payment to any original contractor until the original contractor has given the lending institution his affidavit stating:

"(a) That the original contractor has paid in full for all work performed and for all labor, materials, machinery, or fuel furnished by the original contractor and all subcontractors, materialmen, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor shall specifically set forth and identify both by claimant and by amount claimed;

"(b) That no claims exist other than those claims so set forth and identified in the affidavit required by division (B)(4) of this section."

Under the loan agreement, it was the "Owner" or "Builder" who had the obligation to "furnish" the affidavits. It was not Chicago Title's obligation to solicit or prepare them.

By its terms, R.C. 1311.011(B) is expressly applicable "in connection with a home construction contract." R.C. 1311.01(B); *Thompson Elec., Inc. v. Bank One, Akron, N.A.* (1988), 37 Ohio St.3d 259, 264, 525 N.E.2d 761, 766–767; *Erb Lumber Co. v. First Fed. S. & L. Assn. of Lima* (1990), 67 Ohio App.3d 836, 841, 588 N.E.2d 935, 938–939. Thus, the affidavit called for in R.C. 1311.011(B)(4),

known as the "(B)(4) Affidavit," is the "other applicable" affidavit for residential construction contracts and satisfies the loan agreement.

According to the testimony of the escrow officer, Chicago Title obtained a (B)(4) Affidavit from the builder (Herbert) five business days before each and every disbursement made to Herbert.

Plaintiffs never offered any rebutting testimony indicating that Chicago Title failed to obtain the "other applicable" affidavits required by the loan agreement. That issue of fact must be resolved against plaintiffs since they failed to controvert the affidavit.

Plaintiffs also claimed that Chicago Title modified loan draw request documents previously signed by the Nichols without their consent and after talking to the builder. Essentially, plaintiffs claimed that Chicago Title should have notified them when Herbert reduced the amount of the draw requests which plaintiffs had previously signed. This argument is not persuasive.

The loan agreement did not require Chicago Title to obtain plaintiffs' approval of a change in a draw request. The draw requests could be furnished by "the Owner or Builder." There was no contractual obligation for Chicago Title to obtain the plaintiffs' consent to a change in a draw request and such failure could not have amounted to a breach of contract.

Where an escrow contract makes no reference to an obligation, the escrowee has no duty under the contract to perform such obligation. *Janca v. First Fed. S. & L. Assn. of Cleveland* (1985), 21 Ohio App.3d 211, 213, 21 OBR 225, 227–228, 486 N.E.2d 1216, 1218–1219 (escrow agent not responsible for failing to obtain occupancy permit where the escrow agreement contained no such obligation). If there is no requirement in a contract to notify a party regarding certain events, no action can lie for the failure to provide such notice. *First Fed. S. & L. Assn. of Akron v. Cheton & Rabe* (1989), 57 Ohio App.3d 137, 141, 567 N.E.2d 298, 302–303 (loan contract required notice of changes in interest rates but not of the borrower's "cost of money"; therefore, bank was under no actionable duty to notify the debtor of changes in the cost of money).

Mr. Nichols conceded that it was only his "opinion" based on his legal experience that Chicago Title should have notified him of any draw request changes, but that his opinion was not based upon any document. Since no obligation to notify plaintiffs of changes in the draw requests was contained in the loan agreement between the parties, and this was an integrated document fixing the respective obligations, the parol evidence rule excludes Mr. Nichols's unsupported "opinion" from consideration. *First Fed. S. & L. Assn. of Akron, supra,* 57 Ohio App.3d at 141, 567 N.E.2d at 302–303; *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265, paragraph two of syllabus.

"Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923; *Yaroma v. Griffiths* (May 18, 1995), Cuyahoga App. No. 67635, unreported, at 14, 1995 WL 307745. "When the terms of the contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Shifrin v. Forest City Ent.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501.

In any event, when the draw request was modified, it always resulted in less money being disbursed by Ameritrust and Chicago Title than plaintiffs and Herbert had already approved. Chicago Title did not ever disburse *more* than plaintiffs approved. Nothing in the loan agreement prohibited Chicago Title from disbursing less than the amount shown on the draw request. In fact, "the statute [R.C. 1311.011(B)] does not require the bank to disburse the entire amount listed in the affidavit." *Erb Lumber Co., supra,* 67 Ohio App.3d at 844, 588 N.E.2d at 941 (summary judgment in favor of residential construction lender affirmed). Mr. Nichols admitted that he approved of every dollar paid to Herbert. He even "reluctantly" approved the last payment to Herbert, admitting that he told no one of his reluctance. Under these circumstances, the trial court did not err in granting summary judgment on plaintiffs' contract claims.

Plaintiffs also failed on their negligence claims by failing to establish a duty of care which defendants breached. In *Schwartz v. Bank One, Portsmouth, N.A.* (1992), 84 Ohio App.3d 806, 619 N.E.2d 10, a borrower alleged that the lender made unauthorized changes in the interest rate during the life of the loan. *Id.* at 808, 619 N.E.2d at 11. The borrower alleged that those unauthorized changes were made "intentionally, willfully and fraudulently." *Id.* The issue before the court was whether the action sounded in contract or tort.

The court concluded that the case was a contract case, not one in tort:

"If a petition states a cause of action in contract, the nature of the action is not changed by the mere fact that there is also contained therein a charge of tortious conduct.

"Thus, a cause of action cannot be classified a tort action simply because the appellant used the term 'fraudulently' in her pleading. Moreover, the Ohio Supreme Court has held that the addition of the adverbs 'intentionally' and 'willfully' do not change the nature of the cause of action; they only tend to emphasize that the action was done 'in utter disregard of the rights of the defendants in error and with an evil and wicked purpose.' *Ketcham v. Miller* (1922), 104 Ohio St. 372, 377, 136 N.E. 145, 146. See, also, *Tibbs v. Natl. Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 290, 6 O.O.3d 300, 305, 369 N.E.2d 1218, 1224–1225." *Schwartz,* 84 Ohio App.3d at 810, 619 N.E.2d at 12.

The court went on to state that "once we remove the three adverbs, 'intentionally, willfully and fraudulently' from the allegation, we are left with the charge that '[t]he defendant made unauthorized changes * * *.' " *Id.* at 810, 619 N.E.2d at 12.

Likewise, in this case, plaintiffs allege that Chicago Title made "unauthorized changes" in the loan draw requests, thereby negligently administering the loan. As in *Schwartz,* plaintiffs gain no advantage in asserting that these changes and administration of the loan amounted to "negligence" or "willful misconduct." The claims in this case were based on the loan agreement as was the case in *Schwartz* (a promissory note). Any duties that defendants had arise out of the framework of the loan agreement. No other duties are alleged by plaintiffs. "Where the duty allegedly breached by the defendant is one that arises out of a contract, independent of any duty imposed by law, the cause of action is one of contract." *Id.,* 84 Ohio App.3d at 810, 619 N.E.2d at 13. As stated by this court, "It is not a tort to breach a contract, no matter how willful or malicious the breach." *Salvation Army v. Blue Cross & Blue Shield of N. Ohio* (1993), 92 Ohio App.3d 571, 578, 636 N.E.2d 399, 403. "[U]nder Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Continental Cas. Co.* (C.A.6, 1981), 647 F.2d 705, 710. For these reasons, the "tort" claims in Count IV and V of plaintiffs' amended complaint were properly disposed of on summary judgment.

Assignment of Error I is overruled.

"II. The lower court failed to recognize that a fiduciary relationship existed between the appellants and the appellees."

■ The Supreme Court in *Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 66, 419 N.E.2d 1094, 1097, acknowledged that "in most instances the relationship of a creditor to his debtor, governed by principles of freedom of contract, [is] not a fiduciary relationship." Even though Chicago Title was not the lender, but only the disbursing agent for the loan, the same principle applies. The contract in this case expressly provides that no trust relationship was formed between the parties:

"The parties hereto agree, acknowledge and affirm that they are not nor does this agreement create a partnership, a trust relationship, an agency relationship or any other legal or juridical relationship other than that of independent, contracting parties in accordance with this agreement, enforceable, however, at law or equity in accordance with the laws of the State of Ohio."

Because the parties agreed in the loan agreement that there was no trust relationship, no fiduciary relationship could arise.

"While it is true that a fiduciary relationship may be created out of an informal relationship, this occurs *only* when *both* parties understand that a special trust or confidence has been reposed." (Emphasis *sic.*) *Lee v. Cuyahoga Cty. Court of Common Pleas* (1991), 76 Ohio App.3d 620, 623, 602 N.E.2d 761, 763.

Chicago Title's escrow officer stated in a sworn affidavit that he had never understood a fiduciary relationship to exist between Chicago Title and plaintiffs. Plaintiffs never refuted this sworn statement. Mr. Nichols' deposition never addressed the existence of a fiduciary relationship between the parties.

The relationship between plaintiffs and Ameritrust was likewise not a fiduciary relationship. A number of courts have construed the relationship between a lending institution and a customer and have determined that such a relationship does not ordinarily create fiduciary obligations. For instance, in *Stone v. Davis, supra,* 66 Ohio St.2d at 78, 20 O.O.3d at 66–67, 419 N.E.2d at 1097–1098, the court, analyzing *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320, stated:

"In *Umbaugh Pole Bldg. Co. [supra],* we recognized that, in most instances, the relationship of a creditor to his debtor, governed by the principles of freedom of contract, was not a fiduciary relationship. There we held that evidence which revealed that the creditor had given advice to the debtor concerning the operation of the debtor's business was insufficient to transform what was otherwise a business relationship into a fiduciary relationship. In so holding, we conclude that, in the matter upon which the advice there was rendered, the parties were operating at arm's length, each seeking to protect his own legitimate business interests." See, also, *Ziss Bros. Constr. Co., supra,* at 7, 1991 WL 118058; *Houston v. BankOne, Akron* (Oct. 18, 1990), Cuyahoga App. No. 57316, unreported, at 5.

The primary case cited and relied upon in the plaintiffs' brief in support of the recognition of a fiduciary obligation, *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363, supports the position of Ameritrust herein. In *Blon,* the court refused to impose fiduciary obligations as between a creditor and a consumer, finding:

"Thus, we hold that a creditor and consumer stand at arm's-length in negotiating the terms and conditions of a consumer loan and, absent an understanding by both parties that a special trust and confidence has been reposed in the creditor, the creditor has no duty to disclose to the consumer the existence and details of a finder's fee or similar arrangement with a credit arranger. Accordingly, we reinstate the judgment of the trial court in favor of Bank One on the Blon's claim of fraud for failure to fulfill a common-law duty to disclose." *Id.* at 102, 519 N.E.2d at 368.

The assertion that one party reposed a "special trust" in the other party "is insufficient as a matter of law without the allegation that both parties understood that this fiduciary relationship existed." *Lee, supra,* 76 Ohio App.3d at 623, 602 N.E.2d at 763. This court has recently reaffirmed this holding in *Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443, 451, 635 N.E.2d 1326, 1331:

"Such a confidential relationship, however, cannot be unilateral. The Ohio Supreme Court has explained that a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust or confidence has been reposed." (Citations omitted.)

In *Craggett,* the plaintiff claimed that her insurance agent, without her knowledge or consent, used monies accumulated in her annuity policies to purchase other insurance thereby depleting the value of her fund. *Id.* at 446, 635 N.E.2d at 1328. The plaintiff alleged that the insurance agency had a fiduciary relationship with her. *Id.* at 451, 635 N.E.2d at 1331–1332. This court disagreed and affirmed summary judgment in favor of the insurance agency, stating:

"There is simply no evidence which, if reasonably construed, would support a finding that [plaintiff's] ongoing relationship with [the agency] was other than ordinary." *Id.* at 452, 635 N.E.2d at 1332.

Similarly, the Nicholses contend without substantiation that Chicago Title and Ameritrust misapplied the construction loan fund. The terms of the loan agreement clearly refuted a trust relationship existing between the parties. As in *Craggett,* wherein the court held that there was nothing to suggest that the relationship "was other than ordinary," the loan agreement here states that there was no relationship between the parties "other than that of independent contracting parties." Summary judgment was proper on Count III of plaintiffs' claims.

Assignment of Error II is overruled.

Given the disposition of Assignments of Error I and II above, Assignment of Error III is moot and will not be considered. App.R. 12(A)(1)(c).

*Judgment affirmed.*

O'DONNELL and KARPINSKI, JJ., concur.