CINCINNATI FLUID POWER, INC.,
Plaintiff-Appellee,

v.

REXNORD, INC., Defendant-Appellant.

No. 84–3326.

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1985.

Decided Aug. 6, 1986.

Lawrence D. Walker (argued), Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant-appellant.

James M. Moore (argued), Cincinnati, Ohio, for plaintiff-appellee.

Before JONES, KRUPANSKY and GUY, Circuit Judges.

KRUPANSKY, Circuit Judge.

Defendant Rexnord, Inc. appealed the $47,500 jury verdict rendered in favor of plaintiff Cincinnati Fluid Power, Inc. (CFP) in this diversity action based on promissory

estoppel as recognized in Ohio jurisprudence. The circumstances which gave rise to this litigation are set forth below.[1]

CFP is a distributor of hydraulic and pneumatic components located in Blue Ash, Ohio. In November, 1981, CFP President Daniel Kallmyer (Kallmyer) telephoned William Watson (Watson) of Rexnord's Racine Hydraulic Division (Rexnord). Kallmyer related his observations that Rexnord's sales were not doing well in the southwestern section of Ohio and expressed interest in becoming a distributor for Rexnord's products in that area. Watson acknowledged that Rexnord officials were dissatisfied with the current distributor for that area, Dynamic Technology of Dayton, and requested Kallmyer to forward information concerning CFP's capabilities to represent Rexnord. Kallmyer immediately complied.

The next contact between Rexnord and CFP officials was a meeting on December 1, 1981 at Rexnord's offices in Wisconsin. On that occasion, Kallmyer conferred with Watson and Don Spaulding (Spaulding), Rexnord's Racine distribution sales manager. According to Kallmyer, the subjects discussed at the meeting included Rexnord's expectations of a distributor; the specific responsibilities assumed by a distributor; inventory requirements; problems which Rexnord was experiencing with its current distributor; anticipated design changes to Rexnord's products; the importance of Rexnord's reputation for prompt delivery; the distributor personnel requirements in southern Ohio; and a "brief discussion" of the standard written distributor agreement. Kallmyer was given a copy of this agreement to review. Kallmyer acknowledged at trial that it was his business practice, as well as industry custom, for a manufacturer and distributor to enter into a written agreement to memorialize the terms and conditions of any contract.

Kallmyer testified that he did not advise either Watson or Spaulding during the December 1, 1981 meeting that CFP was intent upon acquiring and occupying a larger facility from which to conduct its business, regardless of the outcome of the Rexnord negotiations. This testimony was disputed by Spaulding, who averred that Kallmyer informed him during the December 1 meeting that CFP was anticipating a move in January, 1982, to more spacious quarters because its current facility was inadequate for CFP's present business.

Spaulding wrote to Kallmyer and expressed a positive assessment of the December 1 discussions. Spaulding also enclosed Rexnord's 1982 technical training schedule and a product catalog. On December 14, 1981, Kallmyer invited Spaulding and Watson to visit CFP to view its operations and to further negotiations regarding the distributorship.

Also in December 1981, Kallmyer contacted the First National Bank of Cincinnati to discuss financing inventory and additional expenses which would be incurred if CFP became a Rexnord distributor. At the advice of a vice president of the First National Bank, Kallmyer compiled documents for purposes of applying for a Small Business Administration (SBA) loan.

During February, 1982, Spaulding and Watson visited CFP, according to Kallmyer, "to further our discussions as regarding becoming a distributor for Racine Fluid Power [Rexnord]." This meeting was held at CFP's original facility. During the course of the visit, Kallmyer advised Watson and Spaulding that "if we were to become a Racine [Rexnord] distributor and were to put on the additional people that they felt one had to have in order to back that distributor, we would have to move to other facilities that would accommodate those people." Kallmyer testified that he, Watson, and Spaulding visited proposed new quarters, located in the same office park as CFP, in order to determine "if they felt that was a suitable space for a distributor for Racine [Rexnord] Fluid Power Prod-

---

**1.** This court has issued a previous decision in this litigation, *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.,* 773 F.2d 92 (6th Cir.1985), which was vacated upon the panel's granting of appellant's petition for rehearing, 780 F.2d 548 (6th Cir.1986).

ucts." Kallmyer related that after viewing the prospective location, Watson and Spaulding "said they thought it was nice and would certainly do the job for what was needed." Watson testified that he, like Spaulding, believed that CFP was planning to move regardless of Rexnord's decision concerning the distributorship. However, Kallmyer repeatedly stated that, as of the February 1982 meeting, CFP had not committed either orally or in writing for the new space.

Following the mid-February meeting, discussions continued between CFP and Rexnord concerning Rexnord's performance expectations for a new distributor. One area of exploration was CFP's representation of Snap-Tite and Newton Manufacturing, both of which manufactured hydraulic valves in competition with Rexnord's product lines. CFP had also been doing business in Kentucky and, according to Kallmyer, Rexnord "felt very strongly about that and if we wanted to be considered further we would have to relinquish Kentucky." In a letter to Watson dated March 5, 1982, Kallmyer advised Rexnord that CFP would terminate its Kentucky business and its relationships with Newton Manufacturing and Snap-Tite if products offered by those companies did in fact compete with Rexnord products.

Kallmyer related that as of March 17, 1982, there were no objections or concerns which Rexnord had communicated to CFP which had not been satisfied by CFP. Accordingly, in the March 17 letter from CFP to Rexnord, Kallmyer concluded with the statement that he was "looking forward to your positive decision on the 23rd." He explained that this statement referred to a telephone conversation with Spaulding during which Spaulding advised that the final decision as to CFP's distributorship of Rexnord products would be made by March 23, 1982.

On March 22, 1982, Kallmyer traveled at defendant's request to Rexnord's headquarters and met with another Rexnord official, Chuck Will (Will). During that meeting, Kallmyer assured Will that CFP had no objection to initiating and operating

a service facility in conjunction with the distributorship.

A conference between Kallmyer and Watson had been arranged for that same day at the Holiday Inn near Rexnord's facilities. At the appointed time, Spaulding and Watson joined Kallmyer. Kallmyer related that Spaulding had advised him that Rexnord was desirous of appointing CFP as "our distributor in southwestern Ohio." However, Watson and Spaulding cautioned Kallmyer, "Don't go racing back to Cincinnati to announce this to the world. We will be terminating our distributor down there. They should hear it from Racine [Rexnord]. They shouldn't hear it from someone else." Kallmyer also quoted Rexnord officials as stating "go ahead with the lease [for additional space]," and that the decision was "solid," and that they used the phrase: "You can take it to the bank." Kallmyer further explained that Watson and Spaulding directed him to proceed with executing the new lease after he advised them that the office park manager was eager to have a decision on the new space because other individuals were interested in leasing it. Upon his return to Cincinnati the following day, Kallmyer telephoned his landlord and told him that CFP was desirous of leasing the new space effective April 1, 1982. The lease was executed for a period of 75 months.

Watson and Spaulding admitted telling Kallmyer on March 22, 1982 that Rexnord had selected CFP as its southwestern Ohio distributor, but stated that many critical conditions of the agreement remained unresolved, such as the number of required employees, inventory, and the geographical boundaries of the sales territory. Spaulding testified that the March 22, 1981 meeting included "quite a bit" of discussion about the existing distributorship agreement with Dynamic Technology, which was not scheduled to terminate until June, 1983, but which Rexnord planned to cancel as soon as possible. Spaulding said he did not recall if he directed Kallmyer to "go ahead and move his business." Watson conceded

that he penned the following letter on Rexnord's letterhead on March 23, 1982:

Per our conversation of March 22, 1982, I would like to confirm our intentions to appoint Cincinnati Fluid Power as our distributor in Southwestern Ohio, as soon as we can clear up some administrative detail.

Further, regarding your request for an estimate of the amount of business which we feel would transfer from our existing distributor to your organization once this appointment is made, during Fiscal 1981, the existing distributor's purchases were $896,500. Our best guess is that $600 to $700,000 would transfer.

Should you require anything further, please let me know. Best of luck.

On April 6, 1982 Spaulding met with Kallmyer in Cincinnati. Spaulding testified that he instructed Kallmyer "to hold everything at that point." Spaulding also admitted on cross-examination, however, that he and Kallmyer discussed the composition of the letter announcing CFP as Rexnord's new distributor and that he told Kallmyer that the company had a list of addresses for the announcement. According to Kallmyer, the April 6 discussions also encompassed training sessions which were to be conducted both at CFP and at Rexnord, with a specific training session scheduled for April 19 at CFP's facility.

Pursuant to a suggestion by Spaulding on April 6, Kallmyer dispatched letters to Newton Snap-Tite on April 7, 1982, which explained CFP's relationship with Rexnord and which opined that CFP's agreement with Rexnord "would not seriously affect our relationship" as a representative of those firms. (Kallmyer also testified that CFP continued to distribute Snap-Tite and Newton products at the time of trial.)

Sometime between April 12 and 14, 1982, Spaulding telephoned Kallmyer and, according to Kallmyer, advised CFP for the first time that "they [Rexnord officials] were having a problem with their termination of Ted Theirmann's company [Dynamic Technology] in Dayton and that we had better talk about it." Although the precise date of that conversation is unknown, Kallmyer testified that it occurred after he had mailed the letters to Snap-Tite and Newton Manufacturing and well after he had entered the 75–month lease for the larger facility. Kallmyer acknowledged, however, his awareness that Rexnord would authorize only one distributorship in southwestern Ohio for any given period of time.

Kallmyer further related that on April 16, 1982, Watson and Spaulding visited Kallmyer's office "and they told me at that time that as a result of difficulties they were having they wanted to, in their terminology, withdraw from our agreement." As a result, no formal distributorship agreement was executed and CFP continued to occupy the new premises into which it had moved on April 3 or 4, although CFP had subleased a part of the office space to reduce its expenses.

CFP initiated suit against Rexnord, alleging that it was damaged under a theory of promissory estoppel for conduct of Rexnord's Racine division officials. More specifically, the theory successfully advanced by plaintiff at trial was that Rexnord had promised the distributorship to CFP, and in reasonable reliance upon that promise, CFP had expended time, money, and effort to improve its physical facilities before Racine recanted its promise. Rexnord countered with a defense that it never made a definite promise of a distributorship to CFP and thus CFP's expenditures were not "reasonable." The jury returned a verdict for plaintiff and the court denied defendant's motion for a judgment notwithstanding the verdict (JNOV).

On appeal, defendant Rexnord argued that reversal was warranted due to erroneous jury instructions. Defendant cited as error the trial court's refusal to instruct on "conditional promises" in accordance with § 91 of the Restatement of Contracts 2d and the trial court's instructions to the jury as to damages.

When jury instructions are challenged, the reviewing court must determine if the instructions, taken as a whole, fairly and adequately submit the issues in the case to the jury. *DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir.1985); *United States v. Mattucci*, 502 F.2d 883, 889 (6th Cir.1974).

In *McCroskey v. State*, 8 Ohio St.3d 29, 456 N.E.2d 1204, 1206 (1983), the Ohio Supreme Court reaffirmed its recognition of the doctrine of promissory estoppel as set forth in § 90 of the Restatement of Contracts 2d. Section 90 provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

As observed by Ohio's highest court, the threshold showing of a promise, which should have reasonably been expected to induce action, must be satisfied before a plaintiff is entitled to recover damages under a theory of promissory estoppel. *See also Talley v. Teamsters Local No. 377*, 48 Ohio St.2d 142, 357 N.E.2d 44 (1976).

In the case at bar, plaintiff's evidence disclosed that representations made by Rexnord representatives Spaulding and Watson to Kallmyer during the March 22, 1982 meeting, paired with Watson's March 23 letter confirming Rexnord's intent to designate CFP its southwestern Ohio distributor, constituted a "promise" within the meaning of § 90 of the Restatement of Contracts 2d. Plaintiff further argued that CFP reasonably relied on that promise when it entered the lease for expanded plant and office space, which resulted in damages. Defendant asserted throughout trial that it made no such "promise" on March 22, 1982, but if it did, then the promise was conditioned upon the termination of Rexnord's distributorship agreement with Dynamic Technology and/or consummation of a written distributorship agreement with CFP. In accordance with its defense, defendant requested the following jury instruction:

> If you find from a preponderance of the evidence that Defendant did make a definite and certain offer on March 22, 1982, which it intended to be binding, then you must next determine whether that offer was conditional. Defendant denies that it made an offer on March 22, 1982, but if it did then such an offer was conditional upon the termination of the agreement with Dynamic Technology and the execution of a written contract with Plaintiff. If you find that Defendant's offer of March 22, 1982, was conditioned upon either of the foregoing then you must return a verdict for Defendant.

The requested charge accurately articulated § 91 of the Restatement of Contracts 2d which provides:

> If a promise within the terms of §§ 82–90 is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of the specified time.

The magistrate who presided over the trial refused the requested instruction, stating that his instructions incorporated language that the promise must be definite and specific and that language regarding conditional promises would "be misleading to the jury." Thus, in its charge to the jury, the trial court explained the "preponderance of the evidence" standard and the jury's role in making credibility determinations, and then stated:

> Plaintiff claims that on March 22nd, 1982, Defendant promised to make Plaintiff its authorized distributor for the southwestern Ohio sales area. Plaintiff further claims that it has incurred expenses in reliance on that promise. Plaintiff alleges its expenditures were reasonable and foreseeable in light of the promise itself and because of subsequent actions and declarations of Defendant's representatives.
>
> Defendant claims, on the other hand, that it made no firm or binding commit-

ments on March 22nd, 1982, but only informed Plaintiff that it wanted Plaintiff to be its distributor in Southwestern Ohio.

The legal doctrine that must be used in your deliberations is the ancient doctrine of promissory estoppel and I'll tell you what that means. Ohio law holds that a promise orally or in writing which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or on the part of the third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Ohio law holds that there are four elements you must consider in deciding whether promissory estoppel applies. These are, first, a promise clear and unambiguous in its terms. Second, reliance by the parties to whom the promise is made. Third, the reliance must be both reasonable and foreseeable. And fourth, the party asserting the estoppel must be injured by the reliance.

Now, you should first decide, if a clear and unambiguous promise was made by the Defendant on March 22nd, 1982.

If no promise was made or if you find those March 22nd 1982, discussions were merely tentative or preliminary business negotiations then you must find for the Defendant. In considering this question it is not necessary that you find from the evidence that the Defendant made statements including the words—I'm sorry, includes words such as, quote "we promise." A promise is an offer which is definite and certain which the offeror intends to be binding. It is your function as jurors to decide the intent of the parties.

If, on the other hand, you find a promise made, you must then ask whether that promise reasonably and foreseeably induced reliance on the part of the Plaintiff. You must also decide if that reliance actually caused injury to the Plaintiff.

■ In sum, the court instructed the jury that in order for plaintiff to recover, it must have been established that defendant made a "clear and unambiguous promise" on March 22, 1982, which "promise" constituted "an offer which is definite and certain which the offeror intends to be binding." The instructions as delivered adequately addressed the issue of promissory estoppel. The fatal flaw in these instructions, however, was the critical omission of an explication of the possible conditional nature of defendant's "promise" which was admittedly joined in issue by the defense offered by Rexnord, i.e., that its promise of a distributorship to CFP was conditioned upon termination of the existing distributorship with Dynamic Technology and/or execution of a written agreement. Section 91 of the Restatement of Contracts 2d, by its own terms, directly mandates an instruction on conditional promises as requested by defendant in the case at bar.

It has long been recognized that a party is entitled to a specific instruction on his theory of the case if there is evidence to support it and a proper request for the instruction is made; therefore, where, as here, the general jury instruction failed to incorporate the thrust of the requested instruction, failure to give the requested instruction is error. *United States v. McGuire,* 744 F.2d 1197, 1201 (6th Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985); *Clayton v. Burston,* 493 F.2d 429, 432 (5th Cir.1974); *Bolden v. Kansas City Southern Railway Co.,* 468 F.2d 580, 581 (5th Cir.1972); *Gillentine v. McKeand,* 426 F.2d 717, 724 (1st Cir.1970); *Townsend v. Postashnick,* 414 F.2d 64 (6th Cir.1969); *Megarry Brothers, Inc. v. United States,* 404 F.2d 479, 489 (8th Cir.1968).

The erroneous charge to the jury compels reversal of the jury decision and remand for a new trial. *See, e.g., R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 78–79 (2d Cir.1984) (under promissory estoppel theory, no "clear and unambiguous promise" established where grant of franchise was conditioned on the execution of a written contract); *Gruen Indus-*

*tries, Inc. v. Biller*, 608 F.2d 274, 281 (7th Cir.1979) (conditional promise alleged was not a reasonable basis for reliance and thus not a proper basis for estoppel); *Pacific Cascade Corp. v. Nimmer*, 25 Wash.App. 552, 608 P.2d 266 (conditional promise can serve as basis of estoppel claim only if condition is satisfied prior to action taken in reliance on that promise), *rev. denied*, 93 Wash.2d 1030 (1980).

Defendant's second challenge to the jury instructions was an assertion that the trial court erred to defendant's prejudice by refusing a requested charge to the effect that "the jury in its discretion can give less than what they determine was expended if they feel justice requires doing that." Defendant essentially argued that the jury was permitted to, and did, place CFP in a better position than CFP would have occupied had Rexnord performed its promise, because even if the distributorship agreement had been signed, it would have expired on June 30, 1983. Rexnord urged, *inter alia*, that the court should have specifically limited damages to June 30, 1983. This court agrees.

■ As defendant correctly contended, a damage award is unreasonable if it places a party in a better position than that party would have enjoyed had the culpable party fully performed its obligations. *See Gruen Industries, supra*, 608 F.2d at 281. In the instant case, plaintiff was cognizant of the fact that even if it secured the distributorship agreement in April 1982, that agreement would, by its own terms, expire 14 months thereafter, i.e., June 30, 1983. However, plaintiff negotiated a 75-month lease for the larger facilities, and the amount awarded by the jury obviously reflected the additional expenditures plaintiff incurred over the entire term of the lease. While the charge requested by the defendant was properly denied for failure to accurately state the damage limitations period, the jury should be instructed in the trial following remand that the damages, if any, to which plaintiff is entitled for the increased rental should be limited to June 30, 1983.

Defendant further argued: (1) that there was no "competent" evidence to support the jury award; and (2) that the district court improperly permitted the admission of hearsay evidence which the jury utilized in calculating CFP's increased lease expenses.

■ It is elementary that evidence of damage which is remote or speculative may not be used to prove a loss. Rather, a plaintiff must present facts from which the loss may be reasonably calculated. *Agricultural Services Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977). *See also Baumer v. Franklin County Distilling Co.*, 135 F.2d 384, 390 (6th Cir.) (Ohio law does not permit recovery of speculative damages), *cert. denied*, 320 U.S. 750, 64 S.Ct. 54, 88 L.Ed. 446 (1943).

During trial of the instant dispute, plaintiff claimed four items of damage in the form of increased (1) base expenses; (2) utilities; (3) telephone installation and services; and (4) accountant's fees. Defendant urged on appeal that plaintiff left the "fact and amount" of damage to "conjecture, speculation and uncertainty," and thus the magistrate erred in not granting defendant's motions for a directed verdict or judgment NOV because plaintiff had not adequately established *any* damage resulting from defendant's alleged wrongdoing.

As to the lease expenses, Kallmyer testified that prior to March 22, 1982, CFP paid $450 a month on its sublease for occupancy of its original premises, and that conversations with CFP's landlord led him to believe that upon the expiration of its tenancy in June or July, 1982, CFP could continue to rent the same space with an annual increase of 5% per year for either three or five years. Kallmyer further stated that the total lease expenses for the newly leased premises, which CFP secured after the March 22, 1982 meeting with Rexnord officials, would exceed by $42,732 CFP's lease expenses on its old quarters during the 75-month life of the new lease (from April 1, 1982 to June 30, 1988).

Defendant charged that the court erroneously permitted Kallmyer's hearsay testimony in relating the landlord's statements concerning the rental increases for the old premises if CFP's tenancy were renewed for that space. This testimony is reflected in the trial transcript:

Q. Did you gain an understanding after discussion with Mr. Galenstein as to what the terms of the rent on the old premises would be when your current lease arrangement with the old premises would have expired?

A. Yes.

Mr. Walker: Objection, Your Honor. Hearsay.

The Court: Overruled. You may answer.

A. Yes, I did.

Q. What was that?

A. They were starting at $450.00 per month with a 5 percent increase per year after that and we discussed both three and five year leases and there you are.

Defendant argued that Kallmyer's responses to these questions constituted "hearsay in its purest form," i.e., "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." FRE 801(c). Defendant further explained that "Kallmyer was repeating the substance of out-of-court statements allegedly made by the ... [building owner] indicating their willingness to enter a lease for a term of 3 to 5 years at a starting rent of $450 per month, with the rent to increase at 5 percent per year." The trial court overruled defendant's objection predicated upon hearsay, stating in essence that Kallmyer's statements were not hearsay because he was not attempting

to quote his landlord directly, but was merely relating his understanding of the terms that the parties might have reached had CFP decided to remain at its former location. Interestingly enough, J.H. Galenstein, the manager of the office park where CFP's prior and current premises were situated, testified at trial, but was not interrogated on the subject.

In support of its position that Kallmyer's statements were impermissible hearsay, defendant relied, *inter alia*, on *Data General Corp. v. Scientific Information Management, Inc.*, 745 F.2d 56 (6th Cir.1984). In this unreported decision, which defendant properly cited under Sixth Circuit Rule 24, plaintiff's evidence as to damages was based purely on his own testimony that plaintiff had secured certain unspecified customers who would have brought in additional revenues to his firm had defendant activated plaintiff's computer system within the timetable specified in the agreement. This circuit agreed that such self-serving and unsupported testimony was hearsay which could not serve as the basis of a damage award. Defendant persuasively argued that Kallmyer's testimony as to the rent at the prior location is directly analogous to the plaintiff's improper testimony in *Data General*. As in *Data General*, plaintiff in the instant case could have relied upon other evidence to establish the rental payments under an extension of its lease for the original premises, especially when Galenstein was a witness.

 It is unpersuasive to contend that Kallmyer's testimony, although hearsay, concerned the declarant's statement of future intent such that it was properly admissible pursuant to FRE 803(3).[2] By its own terms, FRE 803(3) does not apply to situa-

---

2. FRE 803(3) provides:

**Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial**

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

**(3) Then existing mental, emotional, or physical condition.** A statement of the de-

clarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

*See generally* Annot., 75 A.L.R.Fed. 170 (1985).

tions, such as the one at bar, where the declarant's statement of intent is used *"to prove the fact* remembered or believed"—in this case to prove the specific amount of CFP's future rent at its original location. Rather, Rule 803(3) is properly utilized in cases where intent *per se* is at issue.[3]

 In contrast, the intent of Kallmyer's landlord as to rent increases in the instant case was irrelevant as to the resolution of the dispute between plaintiff and defendant herein. Rather, the landlord's out-of-court statements were used to prove a fact, i.e., the exact amount of future rents, which served as the basis for calculating damages. Viewed from the proper perspective, Kallmyer's testimony in this respect was proscribed rather than permitted by the express language of Rule 803(3) and the case law interpreting that provision. As it was incumbent upon plaintiff to establish damages through the admission of competent evidence, the use of Kallmyer's hearsay testimony was insufficient to serve as the basis for calculating the difference between rent at the old and new facilities. The plaintiff's failure to meet its burden to adduce competent proof of damages constituted reversible error. *See, e.g., Baumer, supra,* 135 F.2d at 390 (Ohio law does not permit recovery of damages based on speculation).

 Defendant's complaints as to Kallmyer's testimony regarding increased utility and telephone costs at the new location is not well taken, since that information was clearly within Kallmyer's personal knowledge as president of CFP and was supported by the admission of CFP's utility bills into evidence. Defendant's objections to the amount of plaintiff's increased ac-

counting expenses are equally without merit.

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for a new trial.

---

**3.** For example, in *United States v. Williams,* 704 F.2d 315 (6th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983), it was incumbent upon the government to prove defendant's *intent* to possess cocaine in order to obtain a conviction for attempted possession of the illegal substance. Defendant therefore sought to employ Rule 803(3) to allow a witness to relate statements defendant allegedly made to her regarding his intent to utilize large sums of cash found on his person for certain legal purposes rather than for the purchase of cocaine. Similarly, in *Detroit Police Officers' Assn. v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), a critical issue was whether particular police force employment practices were the result of *intentional* racial discrimination against certain officers and thus FRE 803(3) was properly called into play.