**INTERIM HEALTHCARE OF
NORTHEAST OHIO, INC.,
et al., Plaintiffs,**

**v.**

**INTERIM SERVICES, INC.,
et al., Defendants.**

**No. 1:97–CV–2004.**

United States District Court,
N.D. Ohio,
Eastern Division.

July 23, 1998.

**22.** *See Kerr–McGee Chemical Corp. v. Illinois,* 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982) (J. Blackmun).

,Keith A. Savidge, Matthew Kenyon Seeley, Seeley, Savidge & Aussem, Cleveland, OH, for Plaintiffs.

Steven S. Kaufman, David B. Webster, Kaufman & Cumberland, Cleveland, OH, Elaine A. Panagakos, David J. Butler, Swidler & Berlin, Washington, DC, for Defendants.

## MEMORANDUM OPINION

GWIN, District Judge.

On May 22, 1998, Defendants Interim Services, Inc. and Interim Healthcare, Inc. filed for summary judgment against the three Ohio plaintiffs in this diversity contract action [Doc. 65]. Defendants argue they are entitled to judgment on all claims. In their

complaint, the plaintiffs claim the defendants breached their health care franchise agreements. Plaintiffs claim the defendants breached this agreement when the defendants misrepresented that Medicare would reimburse royalty payments the plaintiffs made to the defendants.

The Court finds defendants did not misrepresent plaintiffs' right to be reimbursed for royalties the plaintiffs paid defendant. In fact, the defendant advised plaintiffs that reimbursement was not certain. Instead, plaintiffs' damages arose from the acts of an unrelated fiscal intermediary. More important, the Court finds no material factual issues exist.

Because all material evidence shows defendant advised plaintiffs of the potential that plaintiffs would not be reimbursed for franchise fees, the Court finds the defendants did not breach the franchise agreements and that plaintiffs have not made out a case of fraudulent concealment, negligent misrepresentation, promissory estoppel, or breach of a fiduciary duty. The Court grants the motion and dismisses this action.

## I. Procedural history

On August 1, 1997, plaintiffs filed a complaint against Defendant Interim Services. In their second amended complaint against both defendants, plaintiffs make claim for breach of contract (Count I), intentional or negligent tortious misconduct (Count II), promissory estoppel (Count III), and breach of fiduciary duty (Count IV). In their complaint, plaintiffs seek declaratory and injunctive relief (Count V), and $10 million in compensatory damages and $10 million in punitive damages.

After filing its complaint, plaintiffs sought interim injunctive relief. As to this request,

Judge Patricia Gaughan denied the plaintiffs' request for a temporary restraining order and a preliminary injunction. The injunction sought would have prevented Defendant Interim Services from establishing a new franchise in plaintiffs' northern Ohio territory.

On September 9, 1997, defendants filed a motion to dismiss the amended complaint, or in the alternative, for summary judgment. The Court never ruled on that motion. Instead of ruling upon this motion to dismiss, Judge Gaughan allowed plaintiffs to conduct discovery before responding to the summary judgment motion. She gave plaintiff until June 1, 1998, to respond. During this time, defendants filed a second motion for summary judgment. Today, the Court addresses this second motion for summary judgment.

## II. Factual background [1]

Plaintiffs,[2] the parent holding company and its two wholly-owned subsidiaries, provide home health care services to patients in northern Ohio. In providing home health care services, plaintiffs act as franchisees of Defendant Interim Services, Inc., its predecessor, and its successor, Defendant Interim Healthcare, Inc. The parties franchiser-franchisee relationship is controlled by a written franchise agreement. In 1982, plaintiffs received as an assignment the rights in the franchise agreement dated February 4, 1974. The parties executed another franchise agreement on January 27, 1994.

The defendants, both Delaware corporations, have their principal place of business in Ft. Lauderdale, Florida.[3] The defendants operate, license and franchise others to operate health care service businesses which use the defendants' system and service mark in designated geographic areas.

---

**1.** The Court will rely on the plaintiffs' version of events as they oppose the summary judgment motion. *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir.1990).

**2.** Plaintiff Interim HealthCare of Northeast Ohio, Inc. is an Ohio holding company. Plaintiff Interim HealthCare Home Health Agency of Cleveland, Inc. is a wholly-owned subsidiary of Interim HealthCare of Northeast Ohio, Inc. and provides home health care services, primarily to Medicare-eligible patients. Plaintiff Interim HealthCare Nursing Services of Cleveland, Inc.

also is a wholly-owned subsidiary of Interim HealthCare of Northeast Ohio, Inc. and provides non-Medicare home health care services to institutions and the public. The majority of the stock of each of the plaintiff corporations is owned by Lee Passell.

**3.** Defendant Interim Healthcare, Inc. was formerly a division of Interim Services, Inc. In August of 1997, Interim Healthcare, Inc. was spun off as a separate corporation and operates the health care side of Interim Services' temporary staffing business.

In the mid–1970s, defendants' predecessor began providing Medicare reimbursable services. Medicare home health agencies provide intermittent home health care to Medicare-eligible participants, primarily the elderly and the disabled.

Under the Medicare program, Medicare reimbursed home health agency providers for services on a cost basis to a predetermined cap. To carry out this reimbursement, Medicare uses fiscal intermediaries to review and audit the provider submissions for compliance with the Medicare program. On final cost report settlements, the fiscal intermediary determines the amount of reimbursement or overpayment for the given fiscal year.

In 1982, plaintiff purchased a franchise from a former owner. Before completing this purchase, Lee Passell, plaintiffs' primary shareholder, visited defendants in Florida. During this visit, he was assured the Health Care Financing Administration and the fiscal intermediaries [4] would recognize 3% of the 5% royalty as an allowable and reimbursable Medicare cost. Passell was not informed that a number of franchisees had experienced challenges or disallowances of their royalties.

After purchasing a franchise, plaintiff was audited by the fiscal intermediary. During this 1982 audit, the fiscal intermediary questioned the royalty as an allowable cost. After having reimbursement for the royalty questioned, Passell contacted the defendant and received materials for submission to the fiscal intermediary to justify the royalty reimbursement.[5] Passell used this material and the fiscal intermediary changed its posi-

tion and approved the royalty as an allowable cost.

In June 1984, defendants changed the royalty plaintiffs paid to defendant. After this change, plaintiffs would pay 3% of the Medicare payments. Formerly, plaintiffs had paid 5% of the Medicare payments. Defendant modified the royalty because changes in the Medicare program had increased competition from hospital-based home care programs.

In making these modifications, defendants described the possibility that Medicare would not reimburse royalty payments. The new agreement contained the statement, "as owners in the past have done, anyone considering certification must weigh the possibility that no royalty will be reimbursed by a government program."[6]

In the fall of 1984, Passell learned that changed Medicare policies would adversely affect certain franchisees. In a December 10, 1984 letter, Passell expressed his concerns to defendant's president. Responding to plaintiffs' letter, Ken Rickert, the then head of the defendant predecessor's Home Health Care Operations, stated his belief that at least 3% of the franchise fee would continue to be reimbursed.[7] Relying on this and other discussions with defendants, Passell says he continued to expand his Medicare business.

By 1986, challenges to franchisees' requests to have royalty payments reimbursed had become a problem for franchisees. Defendants hired James Happ, a Medicare ex-

---

**4.** The Medicare program is administered by the Health Care Financing Administration ("HCFA"). HCFA contracts with fiscal intermediaries to oversee the Medicare program within defined geographic areas and to adjudicate contract claims.

**5.** During the 1970s, the federal government had its own fiscal intermediary called the Office of Direct Reimbursement. In the late 1970s, there was a question whether or not the royalties defendants' predecessor charged its franchisees was an allowable or reimbursable Medicare cost. Following a meeting between the Office of Direct Reimbursement and representatives of the defendants' predecessor, the Office of Direct Reimbursement published a letter dated June 13, 1978, directed to the then president of the defen-

dants' predecessor. In it, the government agency informed the defendants' predecessor that approximately 3% of the then 5% royalty would be deemed an acceptable Medicare reimbursable amount.

**6.** Plaintiffs say the royalty modification agreement failed to point out, however, that this was not a mere possibility but, in fact, a number of fiscal intermediaries were not allowing the royalty as an allowable cost.

**7.** Rickert indicated that the problems Passell noted in his letter reflected a misunderstanding by the applicable franchisee of the nature of the Medicare reimbursement system, and had nothing to do with royalty disallowances. (Passell Dep. at 56, 57, and 286).

pert, to deal with the problem.[8] When Happ was hired, he learned that the previous Medicare policy on royalty reimbursement no longer applied. In May 1986, representatives of the Blue Cross and Blue Shield Association informed Happ that the old formula no longer accorded with Medicare program policy and that royalty fees had to be reviewed in accordance with HCFA publication 15–1, a Medicare reimbursement regulation. Apparently, at that time, Blue Cross encouraged the defendants' predecessor to follow a so-called "componentized analysis" formula set forth in Blue Cross and Blue Shield administrative bulletin series 1401.

On May 30, 1986, Happ sent a memo to all franchises. He indicated that Blue Cross had informed the defendants that "componentized analysis" would be the format used to determine whether franchise fees were reasonable when compared to the fair market value of the services received. Happ also warned that the previous flat rate for royalty reimbursement would not be accepted in the future.[9] On October 6, 1986, Happ transmitted certain "componentized analysis" documents. Plaintiffs assert that Happ failed to disclose the extent of the disallowance problem in either the May or the October 1986 memos. Passell says the memos did not contain any details or specifics of the disallowances.

Until 1995, Passell continued to believe that his royalty payments to the defendants would be accepted as allowable Medicare costs. During this time, his submissions to the fiscal intermediary for royalty payment reimbursement were accepted.

In the fall of 1995, plaintiff's ability to receive government reimbursement for his royalty fees changed. At that time, plaintiffs' fiscal intermediary told Passell that future submissions for royalty reimbursement need have componetized analysis. In response to the fiscal intermediary's requirements, Passell submitted componetized analysis to support plaintiffs' 1995 request for royalty reimbursement of 3%. In 1996, Passell again submitted a componentized analysis to support plaintiffs' request to have the government reimburse plaintiffs 3% royalty payment. The fiscal intermediary denied these amounts in total. As the result of this denial, Passell paid back approximately $500,000 in previously reimbursed royalty costs.

In this case, plaintiffs principally claim defendants' wrongly did not disclose that between 1986 and 1995 franchisees were continuing to experience disallowances. Without such information, plaintiffs say they continued to expand their Medicare business. Plaintiffs say this failure to disclose continued until 1994. Plaintiffs claim that if Passell had known of the risks of the Medicare royalty disallowance, he would have kept his Medicare business smaller and avoided damages.

### III

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997).

However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

8. By the time Happ was hired, as many as 25% of the defendants' franchisees providing Medicare services were experiencing challenges or disallowances. This rate continued throughout his tenure from 1986 to 1992. During that time, various fiscal intermediaries questioned approximately 100 cost reports. Happ never outlined the details of specific disallowances with other franchisees.

9. Passell has no recollection of receiving this letter from the defendants. (Passell Dep. at 139).

summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections,* 141 F.3d 252, 258–60 (6th Cir.1998).

Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505.

## IV

In Count I, plaintiffs make claim that the defendants committed a material breach of contract. If the Court finds a material breach, this would excuse the plaintiffs from paying future royalties to the defendants and relieve them of other obligations under the franchise agreements. Defendants argue they are entitled to summary judgment on Count I because plaintiffs cannot show that the defendants breached the franchise agreements.

Plaintiffs assert that defendants breached the franchise agreement "or duties expressly or impliedly imposed therein by:

a. Failing to acquire appropriate expertise in the area of medicare cost reimbursement.

b. Failing to develop management and information systems including, but not limited to, componentized analysis that would render inclusion of royalty fees in the operating costs acceptable to medicare intermediaries.

c. Failing to inform or train Interim franchisees and their employees in the proper method of accounting, documenting, processing and supporting royalty fees as allowable costs.

d. Failing to disclose in required disclosure documents and elsewhere to [plaintiffs] and other franchisees the fact that royalty fees may not constitute medicare reimbursable costs.

e. Erroneously informing [plaintiffs] that royalty fees were includable in cost[s] for medicare reimbursement purposes.

f. Failing to provide legal advice and support.

g. Failing to disclose discussions and negotiations with HCFA on the issue of royalties as allowable costs.

h. Failing to take pro-active steps with HCFA and Fiscal Intermediaries to resolve the royalty issue."

Second Amended Complaint, ¶ 37.

The plain terms of the defendants' contractual obligations to plaintiffs are set forth in paragraph 7 of the 1974 franchise agreement. Paragraph 7 provides that in consideration for the royalty fee the defendants would provide plaintiffs with the following services and materials:

(a) Training licensee in the operation of the franchise.

(b) Furnishing an operating manual which will be updated from time to time.

(c) Keeping licensee informed with respect to new developments and procedures in the operation of this franchise.

(d) Cooperating with licensee and obtain the contracts for its services from government or industry.

(e) Assisting in the development and preparation of sales and promotional campaigns and material.

(f) Furnishing national account leads.

(g) Analyzing periodically the sales program, promotional efforts, financial status and other aspects of licensee's business, all of which shall be based on data submitted by licensee and to make suggestions based on such analysis.

(h) Assist licensee in the administrating of its insurance program and claims and the handling of its payroll taxes and unemployment claims based upon information submitted by licensee.

(i) Whenever possible, and with the cooperation of the licensees, to obtain master insurance policies for their benefit.

Second Amended Complaint, ¶ 22.[10]

 Though plaintiffs argue Medicare reimbursement issues were an "innate ingredient" of broad requirements in the franchise agreements, the Court finds that none of these provisions in Paragraph 7 of the franchise agreements resemble the requirements on Medicare reimbursement of royalty fees that plaintiffs list in their complaint. There is no provision in the franchise agreements imposing an obligation on the defendants regarding Medicare reimbursing a franchisee's royalty payments.

 Ohio law[11] recognizes the principle that if a contract "is clear and unambiguous, there is no issue of fact to be determined and summary judgment is appropriate." *JWP/Hyre Electric Co. of Indiana v. Mentor Village School District*, 968 F.Supp. 356, 360 (N.D.Ohio 1996). *See also Winningham v. North American Resources Corp.*, 42 F.3d 981, 985 (6th Cir.1994) ("Under Ohio law, courts are required to give unambiguous contract provisions their plain meaning"); *Marentette v. Local 174, United Auto Aerospace and Agricultural Workers of America*, 907 F.2d 603, 612 (6th Cir.1990) ("the interpretation of an unambiguous contract is a matter of law for the court, and a party's interpretation is not permissible evidence"); *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F.Supp. 1031, 1038 (N.D.Ohio 1996) ("if the contract clearly and unambiguously precludes the alleged claim, dismissal is appropriate"). Furthermore, the question of whether the contract terms are ambiguous is itself "a question of law for the court to determine." *Marentette*, 907 F.2d at 612.

 The Court does not find ambiguity regarding reimbursement of royalty fees. Plaintiffs cite provisions which are silent on the question. Though the express terms of the contract do not disclose special Medicare reimbursement duties, plaintiffs attempt to find support for their interpretation in an expert's affidavit. Plaintiffs offer the affidavit of Robert Kushell as a "franchise operations expert." Kushell's affidavit is introduced to say what the defendant's duties and responsibilities ought to be in securing Medicare for reimbursing royalty payments under terms of the franchise.

In *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273 (6th Cir.1997), the Sixth Circuit upheld summary judgment for an insurance company. The insurance company claimed there was no coverage for an accident under terms of its insurance policy. In reaching that conclusion, the court did not allow proffered "expert" testimony on the interpretation of insurance contracts. *Id.* at 1280–81. *See also Payne v. A.O. Smith Corp.*, 627 F.Supp. 226, 228–29 (S.D.Ohio 1985) ("law of the Sixth Circuit plainly prohibits" expert opinions on the law of the forum).

The Court will not consider Kushell's affidavit. The Court does not find the contracts at issue here ambiguous. Having found the contract unambiguous, the expert's testimony intrudes into the province of the Court. *Marentette*, 907 F.2d at 612 ("the interpretation of an unambiguous contract is a matter of law for the court, and a party's interpretation is not permissible evidence"). *See also* Fed.R.Evid. 702.[12]

Further, evidence in the record shows defendants tried to secure Medicare reimbursement for franchise royalty payments and that defendants warned franchisees of the risk of non-reimbursement. Throughout much of the time period at issue in this case, the defendants employed individuals, such as James Happ. Happ assisted franchisees with Medicare cost reimbursement issues, including royalty reimbursement. The defendants

---

10. Paragraph 7 of plaintiffs' 1994 franchise agreement contains the same obligations, except the obligation to "train licensee in the operation of the franchise."

11. In a diversity action the law of the forum state controls. *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir.1991). The parties do not dispute that Ohio law applies to the substantive legal issues in this lawsuit.

12. Federal Rule of Evidence 702 reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

developed a model componentized analysis in 1986, and provided that information to every franchisee that requested it. Beginning in 1984, the defendants also cautioned plaintiffs and all of its franchisees to "weigh the possibility that no royalty will be reimbursed by a government program." Defendants periodically reiterated that warning. In August 1996, defendants met with government officials on the issue of royalties as allowable costs. In addition, representatives of the defendants met with numerous fiscal intermediaries during the 1980s, in an attempt to resolve royalty disallowance issues for particular franchisees.

■ Plaintiffs' breach of contract claim also fails on the issue of damages. A plaintiff's "[d]amages must arise as a result of the breach and must 'naturally and necessarily flow' from the breach of contract." *Nichols v. Chicago Title Ins. Co.,* 107 Ohio App.3d 684, 691, 669 N.E.2d 323 (1995) (citations omitted). Where the alleged damages "result[ ] from circumstances which were not the responsibility" of the purportedly breaching party, the breach of contract claim cannot survive. *Id.*

■ Plaintiffs claim damages of the franchise fees as to which Medicare denied reimbursement; their legal fees to appeal that determination; and losses which they claim to have incurred from "downsizing" their Medicare business as a result of the royalty disallowance. Thus, plaintiffs' alleged damages flow from the Medicare royalty disallowance. However, the defendants did not cause these claimed damages. These costs were the result rather of the fiscal intermediary's determination. The fiscal intermediary is an independent third party acting on behalf of the federal government.

Plaintiffs concede this causation argument, but argue instead that the defendants committed a material breach because they did not adequately warn franchisees of the extent of the number of past disallowances and the substantial losses other franchisees suffered. For the defendants' breach to have caused the damages plaintiffs claim here, the "obligation" would have to have consisted of a guaranty that the fiscal intermediary would deem royalties reimbursable costs. Plaintiffs

do not point to any provision in the franchise agreements that could sustain such an obligation. Since plaintiffs' contract damages result from the actions of the fiscal intermediary and was not the responsibility of the defendants, the breach of contract claim must fail. *Nichols,* 107 Ohio App.3d at 691, 669 N.E.2d 323 ("Plaintiffs admitted that the alleged additional expense to complete [contract] resulted from circumstances which were not the responsibility of [defendants] and we believe that this admission was fatal to their claims.")

Defendants are entitled to summary judgment on Count I because plaintiffs have not shown, and cannot show, defendants committed a material breach of the franchise agreements when defendants did not do more to have Medicare underwrite the plaintiffs' royalty payments to the franchisor.

## V. Tortious misconduct

In Count II of their second amended complaint, plaintiffs make claim against defendants for "intentional or negligent tortious misconduct." In briefing this motion, the parties have considered the claim as sounding in fraudulent concealment or negligent misrepresentation.

### A. Fraudulent concealment

■ The elements of common law fraud in Ohio are: "(a) a representation, or where there is a duty to disclose, a concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying on it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Lynch v. Dial Finance Co. of Ohio No. 1, Inc.,* 101 Ohio App.3d 742, 750, 656 N.E.2d 714 (1995), *appeal dismissed,* 73 Ohio St.3d 1410, 651 N.E.2d 1308 (1995) (citations omitted).

The plaintiffs do not raise any material factual disputes showing breach of a duty to disclose. The plaintiffs do not raise any ma-

terial factual disputes showing plaintiffs actually relied on the alleged misrepresentations.

■ Plaintiffs argue that defendants did not tell them the details of royalty disallowances other franchisees experienced over the years. Plaintiffs claim that, if alerted, plaintiffs would have altered their own business plans. This allegation, even if true, is insufficient for a claim of fraudulent concealment.

■ The presumption in business transactions, where parties are dealing at arm's length, is that neither party has a duty to disclose material information to the other. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988). The law of deceit does protect an interest in making business judgments without being misled by others resulting in financial loss. *Starinki v. Pace*, 41 Ohio App.3d 200, 203, 535 N.E.2d 328 (1987). An action for fraud and deceit can be maintained not only if affirmative representations were made, but also for negative misrepresentations, "such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." *Id.*

■ The Supreme Court of Ohio has identified the following circumstances which may give rise to such a duty:

> . . . a party to a business transaction in a fiduciary relationship with another is bound to make a full disclosure of material facts known to him but not to the other. Such a duty may also arise out of an informal relationship where both parties to a transaction understand that a special trust or confidence has been reposed. Full disclosure may also be required of a party to a business transaction "where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts."

*Blon*, 35 Ohio St.3d at 101, 519 N.E.2d 363 (citations omitted). In the absence of a fiduciary relationship,[13] in order to establish that a duty to disclose' existed here, plaintiffs must establish that disclosure of the supposedly "concealed" information "[was] necessary to dispel misleading impressions that

[were] or might have been created by partial revelation of the facts." *Id.*

Plaintiffs cannot make such a showing. Since 1984 defendants did communicate to plaintiffs the risk that Medicare would not reimburse the franchise royalty, along with a specific warning to "weigh" that risk in their own Medicare business planning. Plaintiffs' principal, Lee Passell, acknowledged in his deposition that those communications suggested the possibility that his royalties would not be reimbursed at all. Passell acknowledged that in October 1986 defendants told him that fiscal intermediaries had disallowed royalty reimbursement for other franchisees. Further, in 1990, at meetings of franchise owners defendants told Passell again about componentized analysis, and about the existence of problems relating to royalty reimbursement.

Passell claims he paid little attention to these communications because he lacked information about "the history of [royalty] challenges to other owners." Without more, the Court cannot find that this lack of history gave rise to a misleading impression.

Based on Passell's own testimony, plaintiffs cannot establish that defendants left a "misleading impression" regarding the royalty reimbursement issue, and that defendants had some further duty to speak.

■ A claim for fraudulent concealment also requires evidence that the defendant acted with the intent of misleading another into relying on the alleged concealment. *Lynch*, 101 Ohio App.3d at 750, 656 N.E.2d 714. Plaintiffs argue that defendants' statement that disallowance was "possible" is fraudulent because disallowance was actually "likely" and "probable." Plaintiffs state that they "believe that defendants purposefully concealed or downplayed these risks [regarding royalty reimbursement] to ensure royalties and avoid a franchisee revolt." This belief is insufficient to raise an issue regarding fraudulent intent, especially where defendants provided periodic warnings to franchisees to "weigh the risk that no royalty will be reimbursed by a government program."

---

13. *See* Section VII, *infra.*

Even if plaintiffs had a duty to speak, plaintiffs do not raise a material factual dispute on the issue of reliance. Plaintiffs claim they would not have expanded their Medicare home health agency program if defendants had properly warned them about the reimbursement issue. However, Passell testified that growing the Medicare business was sufficiently important that in 1984 he was willing to incur the loss of 2% of the franchise royalty.[14] Passell also testified that in 1986 he was prepared to accept the possibility that at some point in the future the 3% royalty would not be reimbursed:

Q: So in 1986 you understood that a fiscal intermediary could have a different interpretation and could conclude that less than three percent is reimbursable, correct?

A: Yes.

Q: All that you agreed with [the fiscal intermediary] is that if such an event occurred, that is if a fiscal intermediary decided that say only one and a half percent was reimbursable that it would be prospective but they couldn't go and challenge old cost reports, correct?

A: Correct.

* * * * * *

Q: In 1986 you were prepared to accept the possibility that Medicare reimbursement would be lower than three percent, correct?

A: Correct. At some future point in time.

Q: In 1986 you were prepared to accept the possibility that whatever the standard was for reimbursement ... by Medicare of royalty would be changed, correct?

A: Correct. At some future point in time.

Q: The only thing you wanted assurance of was that whatever the change would be would only be on a going forward basis and that no one would come after you for past cost reports, correct?

A: Correct.

Passell Dep. at 122–127. The record shows plaintiffs expanded their Medicare business notwithstanding the risks relating to royalty reimbursement. The Court finds plaintiffs cannot establish that they acted in reliance on any purported failure of the defendants to disclose those very risks.

The Court finds plaintiffs have not raised material factual issues precluding summary judgment on a claim of fraudulent concealment.

### B. Negligent misrepresentation

█ Count II may also be construed as a claim for negligent misrepresentation. Negligent misrepresentation may arise against "[o]ne who, in the course of his business ... or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions," may then be liable "for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835 (1989).

█ A party "cannot be held liable for misrepresentation when his statement was true at the time it was made, nor can be held responsible for changes in the law that occurred later." *Kilburn v. Becker*, 60 Ohio App.3d 144, 148, 573 N.E.2d 1226 (1990). Even if defendants did make a representation affirming the reimbursability of a 3% royalty as plaintiffs allege, the facts show that those representations were made in 1982, at a time when the representation was an accurate statement of existing Medicare policy. The defendants informed its franchisees when royalty reimbursement policy changed. Defendants also warned its franchisees periodically against assuming that any royalty was reimbursable. *See Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir.1993) (affirming directed verdict on negligent misrepresentation claim where facts established that defendant "raised more red flags about this investment than they gave any assurance").

Plaintiffs assert that "each and every time [defendants] came into possession of new in-

---

14. At the time Passell purchased the franchise, the royalty on all business was 5%. Defendants reduced the royalty on Medicare business to 3% in 1984 under the royalty modification program.

formation regarding the most recent disallowance and failed to comport their warning memos to reflect such information, it committed another tortuous act." Plaintiffs cite no case law to support such a broad view of this tort.

■ There is no cause of action for "negligent" failure to disclose. *See Textron Financial Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App.3d 137, 149, 684 N.E.2d 1261 (1996) ("Negligent misrepresentation does not lie for omissions; there must be some affirmative false statement"), *appeal dismissed,* 78 Ohio St.3d 1425, 676 N.E.2d 531 (1997). Liability for an omission would lie, if at all, in fraud. *Id.* The Court previously determined plaintiffs cannot establish their fraud claim. The Court also finds they have not raised any material factual disputes whether defendants made misrepresentations of changing Medicare policy on royalty reimbursement. Therefore, the Court grants the defendants summary judgment on Count II.

## VI. Promissory estoppel

In making a "promissory estoppel" claim, plaintiffs say they "reasonably relied on [defendants'] presentation that the three percent (3%) royalty would constitute an allowable Medicare cost to [their] detriment and ha[ve] sustained reliance damages," and "[a]s a consequence thereof, [defendants] [are] estopped from collecting franchise fees for Medicare services and ·must refund all fees collected from [plaintiffs] that have been disallowed by the Fiscal Intermediary." Second·Amended Complaint, ¶ 45–46.

■ In Ohio, promissory estoppel tracks Section 90 of the Restatement of Contracts 2d. That section explains:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Cincinnati Fluid Power, Inc. v. Rexnord, Inc.,* 797 F.2d 1386, 1391 (6th Cir.1986) (*quoting* Restatement and *McCroskey v. State,* 8 Ohio St.3d 29, 456 N.E.2d 1204 (1983)).

■ Plaintiffs have failed to identify any clear "promise" by defendants that Medicare would continue to reimburse the 3% royalty over time. Plaintiffs allege this was confirmed at a 1982 meeting when the reimbursement of a 3% royalty was still an accepted standard. Such a promise is contradicted by the defendants' subsequent communications with franchisees regarding the risks related to royalty reimbursement.

The Court finds plaintiffs have not raised a material factual dispute on whether defendants made a promise and on whether plaintiffs reasonably relied on such a promise. Defendants are entitled to summary judgment on plaintiffs' Count III claim for promissory estoppel.

## VII. Breach of a fiduciary relationship

In Count IV of the second amended complaint, plaintiffs allege the defendants breached a fiduciary relationship. The relationship between defendants and plaintiffs is a business relationship arising out of a franchise for health care services. As to plaintiffs claim that a fiduciary relationship existed, the terms of the franchise agreement undermine plaintiffs' claim. Paragraph 17 of the 1974 franchise agreement noted the "relationship of the parties hereto is that of licensee and licensor, and that in no event shall [defendants] and Licensee be considered partners, joint venturers or agents of or for each other."

■ Under Ohio law, parties in a business relationship do not have a fiduciary relationship "in the absence of a statute expressly creating such fiduciary relationship or, in the alternative, absent an understanding, held by both parties to the subject agreement, that a special trust and confidence has been reposed by the franchisee in the franchisor." *Saydell v. Geppetto's Pizza and Ribs Franchise Sys., Inc.,* 100 Ohio App.3d 111, 130, 652 N.E.2d 218 (1994); *appeal not allowed,* 72 Ohio St.3d 1415, 647 N.E.2d 1389 (1995); *accord Belvedere Condominium Unit Owners' Ass'n. v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993). *See also O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1349–50 (6th Cir.1988) ("franchise agreements do not give rise to fiduciary or confidential relationships");

*Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F.Supp. 1048, 1051 (D.Colo.1985) (under Ohio law, franchise relationship does not give rise to fiduciary duties).

█ The Ohio Revised Code contains no statute which creates a fiduciary relationship between franchisor and franchisee. *Saydell,* 100 Ohio App.3d at 130, 652 N.E.2d 218.

Plaintiffs' president negates the existence of any "shared understanding" between the parties that the plaintiffs reposed a special trust and confidence in the defendants. Passell testified that he had

> a[n] understanding that the franchiser was a resource but could not be counted on exclusively as my primary or only resource, so that we would always inquire and ask for help, input, assistance on issues and where needed would go elsewhere. That's what led me subsequently as an example to retain Dave Elwell in 1985 to assist me with some Medicare—with my Medicare cost report.
>
> ... my expectations it would be a per case by case basis and we would at least inquire and ask for help, assistance, guidance, take advantage of it when it was there and meaningful; and if it wasn't there, we would have to find other resources to do that.

Passell Dep. at 287–88. The hiring of an outside consultant to assist with Medicare issues does not support plaintiffs' claim of a special relationship of trust and confidence. Having made no showing of any statute creating a fiduciary relationship and having made no showing of mutual agreement to repose special trust and confidence in defendants, the claim for breach of a fiduciary duty fails. Plaintiffs do not put forward any plausibile evidence of a fiduciary relationship. The Court enters summary judgment for the defendants on Count IV.

## VIII. Conclusion

For the reasons outlined within this memorandum opinion, the Court grants the defendants' motion for summary judgment and dismisses this action [Doc. 65]. The Defendant Interim Services' prior motion to dismiss or for summary judgment is denied as moot [Doc. 21].

IT IS SO ORDERED.