OPINION {¶ 1} This appeal challenges the decision of the Mahoning County Court of Common Pleas to grant summary judgment to Appellee Ohio Bar Title Insurance Co. ("Ohio Bar Title") against claims of breach of contract and negligence. Appellants Joseph Angelo ("Angelo") and Triad Building Associates, LLC, ("Triad") purchased title insurance from Appellee for property in Canfield, and they contend that there was an undisclosed restrictive covenant in the deed. The supposedly undisclosed restriction stated that, "[a]ny listing of real estate should be done through Antonio Russo unless otherwise agreed upon by both the buyer and seller." The trial court found that this covenant was unenforceable as a deed restriction, did not affect Appellants' title to the property, and therefore, did not support a claim against the title insurance. It is clear from the record that the alleged restriction was not hidden, but was expressly contained in the deed that was prepared weeks before the final sale and was duly recorded. Furthermore, the deed covenant at issue does not create a cloud or defect in the title because it is merely a suggestion and is therefore unenforceable. The title insurance policy only protected against defects adversely affecting the owner's title to the property. The trial court correctly found that the unenforceable deed covenant did not affect the title to the property, and that Appellee was not liable to Appellants. The judgment of the trial court is hereby affirmed.
 FACTS AND PROCEDURAL HISTORY {¶ 2} The property at issue is located in Canfield, and is referred to as Lot No. 35 in Fox Den Plat No. 2. GRPL Enterprises, Inc. ("GRPL") sold the property to Triad in May of 2001. Joseph Angelo is a managing member of Triad. The parties entered into discussion about the sale of the property in late 2000 and early 2001. At the time of the sale there was no building on the property, and it was Triad's intention to build a "spec home" on the lot for resale.
 {¶ 3} The deed was prepared on May 9, 2001. This one-page deed has a brief description of the property, and underneath the description is a short paragraph describing an annual fee for landscaping, a definition of common areas, and one line requesting that any listing of the real estate, "should be done through Antonio Russo," who is Gene Russo's son. Gene Russo is one of the officers of GRPL, which was the entity selling the property. The record indicates that Antonio Russo is not a licensed real estate agent or broker in Ohio. On May 14, 2001, Triad delivered a down payment of $19,000 for the property. Triad's third-party complaint avers that this down payment was made without any purchase agreement in effect and without Triad or Angelo having examined the deed. (1/29/04 Answer to First Amended Complaint Counterclaim and Third-party Complaint.)
 {¶ 4} On May 29, 2001, Triad entered into a settlement agreement for the purchase of the real estate from GRPL. The agreement contained a provision for payment to Federal Title and Abstract Agency, Inc. ("Fed. Title") for a title guaranty premium.
 {¶ 5} Ohio Bar Title is the entity that actually issued the title guaranty on May 31, 2001. The deed was recorded on May 31, 2001. This was the same deed that was prepared on May 9, 2001.
 {¶ 6} Triad subsequently built a house on the property, and in 2002, it was offered for sale. The sales listing did not take place through Antonio Russo.
 {¶ 7} On November 21, 2002, GRPL initiated a lawsuit against Appellants for breaching certain restrictive covenants in the deed, particularly the covenant which requested that future sales listings be done through Antonio Russo.
 {¶ 8} Sometime in 2003, Triad offered the property to Mr. Jerald Rudick, who put a $1000 deposit on it. The record indicates that Mr. Rudick was not told of the pending lawsuit, the potential deed restrictions, or other problems with the house and the property. Mr. Rudick later asked for the return of his deposit, and he did not purchase the property.
 {¶ 9} On September 25, 2003, (while the GRPL lawsuit remained pending), Triad conveyed the property to Norma and Kevin Webb, and the Webbs were later added as defendants in the complaint filed by GRPL.
 {¶ 10} On January 29, 2004, Appellants (Triad and Angelo) filed a third-party complaint against GRPL, Fed. Title, and Ohio Bar Title, for failure to disclose the restrictive covenants in its title guaranty. The complaint alleges that GRPL, Russo, and Fed. Title willfully, wantonly and fraudulently incorporated certain restrictions into the general warranty deed. The complaint also states that GRPL and Russo tortiously interfered when Appellants attempted to resell the property. The complaint further sets forth a contract claim against Ohio Bar Title, and mentions that Ohio Bar "tacitly approved" of the fraud committed by the other third-party defendants.
 {¶ 11} On November 2, 2004, Appellants filed a motion for summary judgment in their defense of the claims made by GRPL. Appellants argued that the alleged restrictive covenants were unenforceable as a matter of fact and law. It is clear that none of the parties in this appeal has ever argued that the restrictive covenants were enforceable, and thus, they all agree with the trial court's judgment at least with respect to this fact.
 {¶ 12} On December 2, 2004, Triad and Angelo filed an amended counterclaim against Fed. Title and Ohio Bar Title, adding a claim of negligence.
 {¶ 13} On February 15, 2005, Ohio Bar Title filed a motion for summary judgment in defense of the claims made by Appellants. Ohio Bar Title agreed that the alleged restrictive covenants were unenforceable. Because the covenants were unenforceable, Ohio Bar Title argued that they did not constitute encumbrances on the property and did not give rise to a claim against the title guaranty.
 {¶ 14} On April 1, 2005, the trial court granted summary judgment to Appellants with respect to GRPL's claim, and also granted summary judgment to Appellee with respect to Appellants' third-party claim. This appeal only involves the dispute between Appellants and Ohio Bar Title. Although the appeal was interlocutory when it was filed, the trial court granted summary judgment to the Webbs shortly after the appeal was filed. The Webbs were the last remaining defendants in the case. Thus, all claims against all parties have now been resolved by the trial court, and this is no longer an interlocutory appeal.
 SOLE ASSIGNMENT OF ERROR {¶ 15} "THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT ON OHIO BAR TITLE INSURANCE COMPANY'S MOTION TO DISMISS APPELLANTS' BREACH OF CONTRACT AND NEGLIGENCE CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BASED ON THE TRIAL COURT'S JUDGMENT ENTRY FINDING THAT THE UNDISCLOSED RESTRICTIVE CLAUSES ADDED TO THE GENERAL WARRANTY DEED BY OHIO BAR TITLE INSURANCE COMPANY'S AGENT WERE NOT ENFORCEABLE AS RESTRICTIVE COVENANTS."
 {¶ 16} This is an appeal of a summary judgment. An appellate court applies a de novo standard of review when reviewing a trial court's decision to grant summary judgment, using the same standards as the trial court as set forth in Civ. R. 56(C). Grafton v. Ohio EdisonCo. (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. When a court considers a motion for summary judgment the facts must be taken in the light most favorable to the non-moving party. Id.
 {¶ 17} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifyingthose portions of the record which demonstrate the absence of a genuineissue of fact on a material element of the nonmoving party'sclaim." (Emphasis in original.) Dresher v. Burt (1996),75 Ohio St.3d 280, 296, 662 N.E.2d 264. The nonmoving party has the reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. Id. at 293, 662 N.E.2d 264. In other words, the nonmoving party must produce some evidence that suggests that a reasonable factfinder could rule in that party's favor. Brewer v. Cleveland Bd. ofEdn. (1997), 122 Ohio App.3d 378, 386, 701 N.E.2d 1023.
 {¶ 18} Although Appellants present nine topics for review on appeal, the ultimate single question is whether summary judgment in favor of Ohio Bar Title was appropriate. The parties do not dispute the language that is in the recorded deed or the language of the title insurance contract. The parties also do not dispute that the deed covenant concerning Antonio Russo is unenforceable. Appellants' argument on appeal seems to be that they still have a viable claim against Ohio Bar Title and the title policy even though the covenant is not enforceable. Since Appellants' third-party complaint is broken down into a contract claim and a negligence claim, the two issues will be dealt with separately. We will also review a purported fraud claim that is apparently being raised on appeal.
1. The contract claim.
 {¶ 19} A title guaranty is an insurance contract, and the first and foremost question in any contract dispute is what the parties intended when they entered the contract. This intent is determined by the words of the contract. Chicago Title Ins. Co. v. Huntington Natl. Bank (1999),87 Ohio St.3d 270, 273, 719 N.E.2d 955.
 {¶ 20} The cover page of the title policy states that Appellee guaranteed that, "title to the land hereinafter described in Schedule A * * * is vested of record as stated in Schedule A, subject only to the mortgage(s), if any, therein set forth and to the liens, encumbrances and defects in title shown or referred to in Schedule B."
 {¶ 21} Schedule A, section 2, states: "The record title to the estate in said land is at the date hereof vested in: Triad Building Associatesas recorded in Official Record Book Volume 5120, Page 540Mahoning County Records." Title A also describes the interest in the land as fee simple.
 {¶ 22} The page and volume number referred to in Schedule A contains the general warranty deed for the property as conveyed on May 31, 2001. The recorded deed contains the covenant at issue in this appeal, stating that any listing of property should be done through Antonio Russo. Schedule A gives full notice to Appellants of the correct deed and where the deed can be found.
 {¶ 23} Schedule B states that, "[r]ecord title to the land described in Schedule A is affected by the following defects, liens, encumbrances, and other matters of record," and then lists 17 restrictions, including taxes, easements, oil and gas leases, and other declarations of restrictions. It does not list the alleged restrictions that are in dispute in this appeal. Since Schedule A of the title insurance contract insured that Appellants would receive a fee simple estate (except for the mortgage also listed in Schedule A), and Schedule B was required to list all other defects, liens, or encumbrances, it would appear that the title insurance policy did not treat the covenant dealing with Antonio Russo as a defect, lien or encumbrance. That does not mean that Appellee is necessarily liable for damages. It simply means that, for whatever reason, whether intentionally or accidentally, Ohio Bar Title did not consider that the Antonio Russo covenant qualifies as a defect, lien or encumbrance. Since the title policy only creates liability for defects, liens and encumbrances on the property, it would stand to reason that Appellee is not liable for failing to draw special attention to the Antonio Russo covenant if this covenant is not a defect, lien or encumbrance, and if the covenant cannot be reasonably interpreted as such.
 {¶ 24} The parties agree that the covenant referring to Antonio Russo is unenforceable. Because Antonio Russo is not and apparently has never been a licensed real estate agent or broker, it is not clear how the covenant could ever have been enforceable. It is illegal in Ohio to act as a real estate agent or broker without a license. R.C. § 4735.02. More importantly, the Antonio Russo covenant is simply a suggestion and uses no mandatory language such as "shall" or "must." The covenant merely stated that Appellant "should" use Antonio Russo to sell the property. The use of the word "should" usually indicates aspirational or directory language, rather than mandatory. Hill v. Christ Hosp. (1998),131 Ohio App.3d 660, 667, 723 N.E.2d 581. The covenant concerning Antonio Russo was simply a vague "agreement to agree" to consider using Antonio Russo as the sales agent. See, e.g., Natl. City Bank, NE v. Abdalla (1999),131 Ohio App.3d 204, 211, 722 N.E.2d 130 (an "agreement to agree" to negotiate is not an enforceable contract).
 {¶ 25} The trial court granted summary judgment to Appellants against the claim made by GRPL on the basis that the covenant was unenforceable, meaning that it is not a restrictive covenant in the sense that it constitutes an actual claim that someone might make against the title. The title insurance contract did not guarantee that the title would be absolutely flawless or that Appellants would never be sued for anything having to do with the wording of the deed or the history of the title. Appellee insured against actual encumbrances, and in this case, there is no encumbrance that gives rise to liability.
 {¶ 26} Appellants rely heavily on this Court's opinion in Lone StarSteakhouse Saloon of Ohio, Inc. v. Quaranta, 7th Dist. No. 02 CA 60, 2002-Ohio-1540. This case provides no particular insight into the issues in this appeal. Lone Star Steakhouse involved two adjacent parcels of land in Boardman, Ohio. Parcel one contained a restaurant and parcel two did not. The deeds to both parcels contained covenants restricting the owner of parcel two from building or operating a restaurant in competition with parcel one for fifteen years. There was never a question in the case about the validity of the restrictive covenant.
 {¶ 27} Ronald and JoAnne Quaranta became owners of parcel one in 1985, and T W Properties owned parcel two. In early 1994, Lone Star Steakhouse entered into a purchase agreement to buy parcel one and its restaurant. In March 1994, prior to the closing date of the sale, the Quarantas released the restrictive covenant on parcel two without informing Lone Star Steakhouse. The reason for removing the restrictive covenant was that Quarantas had hoped to open a tavern on parcel two after the sale of parcel one was completed. Since the restrictive covenant benefited the Quarantas' land, they had the authority to remove the restriction, but not after they had already entered a purchase agreement for the sale of the land.
 {¶ 28} First American Title Insurance Co. issued a commitment for title insurance on parcel one on February 14, 1994, and the commitment listed the restrictive covenant governing parcel two. On the date of closing, May 6, 1994, First American issued an Owner's Policy of Title Insurance, and this also listed the covenant as valid, even though the restrictive covenant had been released in March.
 {¶ 29} In August of 1998 a new tavern opened on parcel two. Lone Star Steakhouse eventually sued the Quarantas for materially changing the terms of the 1994 purchase agreement prior to closing, and sued First American for failing to notify them that the deed restriction had been released after the purchase agreement had been signed but before closing.
 {¶ 30} There are many reasons why Lone Star Steakhouse is inapposite to the facts of the instant appeal. First, Lone Star Steakhouse involved valid deed restrictions, not unenforceable covenants. Furthermore, all the parties agreed that there was a material change made to the property itself prior to closing. When the buyer, Lone Star Streakhouse, entered into the agreement to buy the property, there was a significant restrictive covenant that was of benefit to Lone Star Streakhouse. Prior to closing, though, that covenant was removed, substantially decreasing the value of the property. The major issue in Lone Star Steakhouse
involved the liability of the seller in changing the essential character of the property after the purchase agreement had been executed.
 {¶ 31} In the matter at bar, the entire debate centers around whether an invalid and unenforceable deed covenant can trigger liability in a title insurance contract. In the instant case, the nature of the property did not change as it did in Lone Star Steakhouse. Appellants allege that the exact wording of the property conveyed changed by the time it was entered into the new deed, yet that wording, at least with respect to the Antonio Russo covenant, did not alter the nature of the property that Appellants purchased. These significant differences between the two cases undercuts the relevance of Lone StarSteakhouse for our analysis. The presence of an unenforceable provision in Appellant's deed, no matter how unexpected, cannot be compared to the discovery by Lone Star Steakhouse that a key enforceable deed restriction had been validly released prior to closing and was not disclosed by the title insurance company.
 {¶ 32} It is also difficult to view Appellants' alleged damages in this case as contract damages. That is not to say that they did not suffer some type of loss or damages. They may have had to accept a lower price for reselling the property to the Webbs after Mr. Rudick refused to purchase it. They undoubtedly have had expenses in defending against GRPL's lawsuit. But these expenses do not arise out of the title insurance contract. As we already stated, title insurance only protects against defects in the title. There is no reasonable interpretation of the Antonio Russo covenant that could view it as an enforceable restriction on the property. It is always possible that someone may attempt to challenge or enforce a deed on unreasonable grounds, but that does not give rise to a claim on the title insurance. Ohio Bar Title also did not guarantee that the wording of the deed would be perfect, or that the deed language would conform to the grantee's expectation of what the deed should say. The description of the property transferred is up to the parties, not the title insurance company. The fact that Appellants failed to read the deed at any point does not give rise to contract damages from the title insurance company concerning the exact wording of the deed. As will be noted below, Appellants may have had a claim for damages from some other party based on a different theory of recovery, but not based on the title insurance contract.
2. The negligence claim.
 {¶ 33} Concerning Appellants' negligence claim, they have not alleged any duty of care that could have applied to Appellee other than duties that arose out of the title insurance contract. The issue that Appellants raise sounds solely in contract, even though it is reworded as a negligence claim. A cause of action for breach of contract is not transformed into a tort action simply because the plaintiff uses such words as "willfully" or "intentionally" or "recklessly". Schwartz v.Bank One, Portsmouth, N.A. (1992), 84 Ohio App.3d 806, 810,619 N.E.2d 10; Nichols v. Chicago Title Ins. Co. (1995), 107 Ohio App.3d 684, 696,669 N.E.2d 323. "Where a petition avers the execution of a contract, avers the value of the contract to the petitioner, avers the breach thereof by the defendant, avers the damage to be in a sum equal to the value of the contract, the gravamen of the complaint is the breach of the contract, and the action sounds in contract, and the averment that the breach was unlawful, willful, wanton, and malicious does not change the action from one ex contractu to one ex delicto." Ketcham v.Miller (1922), 104 Ohio St. 372, 136 N.E. 145, syllabus.
Possible fraud claim.
 {¶ 34} Appellants seem to be alleging on appeal that Ohio Bar Title committed some type of fraud, but this was not pleaded in the trial court. Vague allegations of fraud were raised against GRPL and Gene Russo, but the only mention of fraud with respect to Ohio Bar Title was that it "tacitly approved" of the fraudulent conduct of the other third-party defendants. Tacit approval of fraud is not a cause of action. If Appellants believed that Ohio Bar Title committed fraud, they were required to plead this claim with specificity, laying out the facts and circumstances that could establish fraud. Civ. R. 9(B).
 {¶ 35} Even if fraud had been properly pleaded, the record does not support such an allegation. Fraud requires a misrepresentation of a material fact with the intent to mislead another, reasonable reliance on the misrepresentation, and a resulting injury proximately caused by the misrepresentation. Russ v. TRW, Inc. (1991), 59 Ohio St.3d 42, 49,570 N.E.2d 1076.
 {¶ 36} There is no indication that Appellee has ever misrepresented the contents of the deed, and there is only one deed that is referred to throughout the entire record. This deed contains the unenforceable covenant that is the subject matter of this appeal. It contained the Antonio Russo covenant weeks before the sale was finalized. Appellants have never made it clear just how Appellee misrepresented the contents of the deed when the deed was clearly available for inspection prior to, during, and after the completion of the sale of the property.
 {¶ 37} Furthermore, Appellants could not have reasonably relied on any assertion that the deed excluded any mention of Antonio Russo because the covenant was actually in the deed the entire time. Appellants' own third-party complaint states that they never looked at the deed prior to the deed being recorded. Appellants put a down payment on the property without looking at the deed, entered into a title insurance commitment without looking at the deed, and signed the closing documents without looking at the deed. Willful ignorance cannot be equated with reasonable reliance. As the Ohio Supreme Court has said, the failure to read the terms of a contract "drives a stake into the heart" of a fraud claim: " 'A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.' " ABMFarms, Inc. v. Woods (1998), 81 Ohio St.3d 498, 503, 692 N.E.2d 574, quoting McAdams v. McAdams (1909), 80 Ohio St. 232, 240-241,88 N.E. 542, 544.
 {¶ 38} We are mindful that Appellants have successfully alleged the final element of fraud, namely, damages. They have had to defend against GRPL's lawsuit, and they may have lost money in selling the property to the Webbs after the Rudicks no longer wanted it. Nevertheless, damages, by themselves, do not constitute a claim for fraud. Appellants' allegations, and the facts in the record, simply do not connect Ohio Bar Title to the damages that Appellants would like to recover.
 {¶ 39} This appeal is only challenging the judgment that was granted in favor of Ohio Bar Title, and Appellants' relationship with Ohio Bar Title was contractual. It is not our place to say whether Appellants did or did not have a viable fraud claim against some party involved in the original sale of Lot No. 35. It is abundantly apparent from the record, though, that Appellants' claim against Ohio Bar Title, as presented to the trial court, was a contract claim, not a fraud claim or a negligence claim.
 {¶ 40} In conclusion, the record is clear that the deed covenant at issue is unenforceable and that the title insurance contract only covers actual defects and encumbrances on the property, not patently unenforceable claims. It is also clear that there is no basis for a negligence or fraud claim since all aspects of Appellants' argument refer to duties arising under the title insurance contract. Therefore, summary judgment was correctly granted to Appellee, and the judgment of the trial court is affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs.